# CITY AND COUNTY OF DENVER v. NEW YORK TRUST COMPANY.

# CITY AND COUNTY OF DENVER v. DENVER UNION WATER COMPANY ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 642, 643.  Argued October 28, 29, 1912.—Decided May 26, 1913.

The exceptional power of this court to review, upon certiorari, decisions of the Circuit Court of Appeals on an appeal from an interlocutory order is intended to be, and is, sparingly exercised; that power does exist, however, in a case where no appeal lies from the final decision of that court.

While the jurisdiction of the Circuit Court in a case where diverse citizenship exists may also rest upon the fact that the case is one arising under the Constitution of the United States, in which case there is an appeal from the judgment of the Circuit Court of Appeals, that is not the case where the alleged infractions of the Constitution are without color of merit, or are anticipatory of defendant's defense.

A suit to enforce a contract between a municipality and a water company for the purchase, as is claimed, by the former of the water plant of the latter and to enjoin the city from constructing another plant, is not without more a case arising under the Constitution of the United States. In such a case the decision of the Circuit Court of Appeals is final and the writ of certiorari may be exercised.

On a review of an order of the Circuit Court of Appeals granting an injunction in an equity case, this court is not confined to considering the act of granting the injunction, but if it determines that there is any insuperable objection to maintaining the bill it may direct a final decree dismissing it.

The various ordinances of the City of Denver, Colorado, granting and relating to the franchise to the Denver Union Water Company considered and construed; and *held* that they did not require the city at the expiration of twenty years to exercise either the option to renew or the option to purchase reserved in the franchise ordinance, nor did they preclude the city from erecting its own plant.

Where a municipal ordinance grants a franchise to such extent as the city may lawfully grant it, the term is not in doubt, if the city charter expressly limits the term of all such grants.

A limitation in the charter on grants by the municipality is as much part of an ordinance subsequently passed as though written into it.

An ordinance providing for appraisal of a water plant and for submitting to the electors whether the contract shall be extended or the plant purchased at the appraised value, does not amount to an election to purchase the plant. ·

Where the franchise of a water company has expired and the city has lawfully refused to purchase the plant at the appraised value, a charter amendment permitting the municipal authorities to offer the company less than such value and in case of non-acceptance to erect a municipal plant, does not violate the due process clause of the Fourteenth Amendment by subjecting the company to the alternative of accepting less than value for the plant or having it ruined by construction and operation of the municipal plant.

The equal protection provision of the Fourteenth Amendment does not prevent a city from adopting a scheme of municipal ownership as to a single public utility, and a charter provision which prohibits franchises for that purpose does not violate the equal protection provision of the Fourteenth Amendment.

A provision in regard to the acquisition of a municipal water plant *held* in this case not to be a revision *in extenso* of the city charter but only an amendment thereto; and also *held* that none of the objections to the adoption of the amendment to the charter of the City of Denver providing for erection of a municipal water plant are tenable.

187 Fed. Rep. 890, reversed.

THE facts, which involve various elements of a controversy between the City of Denver, Colorado, the Denver Union Water Company and the New York Trust Company, trustee of bonds of the said company, and the construction and validity of the contracts and ordinances and statutes relating to the water supply of Denver, are stated in the opinion.

*Mr. William H. Bryant* and *Mr. Charles W. Waterman*, with whom *Mr. William P. Malburn* and

*Mr. William A. Jackson* were on the brief, for petitioners.[1]

*Mr. Henry McAllister, Jr.*, with whom *Mr. Joel F. Vaile, Mr. William N. Vaile* and *Mr. J. Markham Marshall* were on the brief, for the New York Trust Company, respondent in No. 642.[1]

*Mr. Gerald Hughes* and *Mr. Clayton C. Dorsey* for the Denver Union Water Company, respondent in No. 643.[1]

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This suit presents a threefold controversy, to which the New York Trust Company (a New York corporation), the City and County of Denver (a municipal corportation in Colorado), and the Denver Union Water Company (a Colorado corporation) are the principal parties. They are respectively the successors of similar corporations whose acts, together with their own, created the situation out of which the controversy arose, but it will be convenient to treat them as if they were the original participants in all those acts. Although formerly controlled by a charter enacted by the legislature of the State, the city, in pursuance of an amendment of the state constitution, came in 1904 to be governed by a charter framed and adopted by the people of the city and over which they possessed an exclusive power of alteration and amendment. Laws 1889, p. 124; Laws 1893, p. 131; Const., Art. 20, Rev. Stat. 1908, p. 55.

By the charter from the state legislature (Laws 1889) the city was given power (§ 9) "to construct or purchase

---

[1] The briefs in this case were very elaborate and exhaustive, several hundred authorities bearing on the issues involved are collated and reviewed. This renders it impossible to make abstracts of them.

water works for the use of the city" and generally to do
whatever was "needful . . . in order to supply the
city with water for fire, irrigating, domestic and other
purposes," subject to the qualification (§ 12) that *"all
franchises or privileges"* granted by the city should *"be
limited· to twenty years from the granting of the same."*
April 10, 1890, while that charter was in force, the city,
by an ordinance designated as No. 44 and duly accepted
by the water company, granted to the latter, its succes-
sors and assigns, the right and privilege of laying down,
continuing and maintaining pipes and other apparatus
for the conveyance and distribution of water along and
through designated streets, alleys and public places of
the city, *"to such extent as the city may lawfully grant the
same"* and subject to termination as therein provided.
The ordinance contained various provisions regulatory
of the right and privilege so granted, the duty of the water
company to supply water for private use and for fire
and other public purposes, the rates to be charged private
users, and the hydrant rentals to be paid by the city.
There were also the following sections:

"SEC. 11. At the expiration of *the period of twenty
years* from and after the date· of the passage and ap-
proval of the ordinance, *in case the city shall then elect
so to do*, the said works *may be purchased* by the said city,
and in case the parties can not agree, after such election,
upon the price to be paid by the city for the water works
of the said company, its successors and assigns, then their
fair cash value shall be determined by arbitration, by
five disinterested persons, none of whom shall be residents
of Denver, two of them to be chosen by the city, two
by the company, and the fifth by the four first chosen,
and in case of failure on the part of the company to name
arbitrators for the period of thirty days after the city
shall have named arbitrators and notified the company
so to do, the city may apply to any court having equity

jurisdiction in the county in which the city of Denver shall then be situated for the appointment of two persons of the qualifications aforesaid as such arbitrators, and the court may thereupon appoint two persons, who shall act with the same force and effect as if appointed by the company, and the decision of a majority of said board shall be final and binding upon both parties, and upon the payment, or tender of payment, by said city the said company shall convey to said city all of its property, real or personal, easements, rights and privileges, and thereafter all franchises, rights and privileges which have been at any time theretofore granted said company, its successors or assigns, and which it may then possess, shall cease and be at an end.

"Sec. 12. At the expiration of the said *period of twenty years* the said city *may, at its election, renew the contracts hereby made,* by ordinance to that effect, for a like period of twenty years, but at a price for hydrant rental 10 per cent. less than mentioned in section 10 hereof, for the period remaining after the ten years after May 1st, 1891, and for successive periods of twenty years at the price last aforesaid, as often and as long as the city *may choose.* This section is conditioned, however, upon the full performance by the city of the provisions of section 2 hereof.

"Sec. 19. This ordinance, when the same shall be in writing accepted by The Denver Water Company, becomes a contract between the city of Denver and the said The Denver Water Company, its successors and assigns, and the same shall as to every provision herein contained as fully bind and inure to the benefit of the successors and assigns of the said The Denver Water Company as to the said company. And it is expressly understood that by the acceptance of this ordinance the said The Denver Water Company loses no rights in regard to the occupation of the streets, alleys and public places, or as to the rights of any other person or persons thereto which it now

possesses, but the same are hereby recognized and confirmed and are to be deemed independent of and not merged in any grant in this ordinance elsewhere contained.

"Sec. 20. All mains, pipes, valves and other apparatus now owned by said The Denver Water Company, and composing its plant, and all such mains, pipes, valves, hydrants and other apparatus as said The Denver Water Company, its successors or assigns, shall hereafter lay down or set in or upon any of the streets, alleys or other public places within said city shall be and remain the sole and absolute property of said The Denver Water Company, its successors and assigns, and the said The Denver Water Company, its successors or assigns, shall forever be considered and entitled to be in possession thereof, except in case of purchase by said city under the terms of this ordinance, or some agreement between said city and said company, its successors or assigns, when all rights of whatsoever nature of said company, its successors or assigns, in and to the subject-matter hereof shall vest in said city.

"Sec. 21. While the consideration for the respective agreements of the city and the company are upon each side the several agreements of the other, all of the several grants, contracts and agreements in this ordinance contained are to be deemed independent agreements with the same force and effect as if each section of this ordinance was contained in a separate ordinance by itself."

By a written contract made in 1870 the city had granted to the water company a sole and exclusive right to lay pipes within the city for use in the distribution and sale of water, but that contract had been expressly annulled by another made in 1874, whereby the city granted to the company a right of like character expressly limited to a period of seventeen years from May 1 of that year. What was said in §§ 19 and 20 of the ordinance of 1890 about rights and a water plant already possessed by the water

company had reference to the rights then held and the plant then operated under the 17-year contract, which was within a year of expiration, and to some other rights mentioned in the record and equally without material bearing here.

By an amendment of the state constitution in 1902—it being the amendment under which the home-rule charter was framed and adopted two years later—the city was empowered to construct, purchase, maintain and operate water works for the use of itself and its inhabitants, and to issue bonds, after an approving vote of the taxpaying electors, in any amount necessary to carry out that power; and this amendment declared that "No franchise relating to any street, alley, or public place of the said city and county shall be granted except upon the vote of the qualified taxpaying electors." Article XX, §§ 1 and 4.

October 2, 1907, about two and one-half years before the expiration of the 20-year period specified in the ordinance of 1890, the city adopted and the water company accepted an ordinance designated as No. 163, providing, first, for an immediate appraisement, by appraisers selected conformably to § 11 of the ordinance of 1890, of the fair cash value of all the property of the water company and its auxiliary companies then used in supplying the city and its inhabitants with water; second, for the immediate fixing by the appraisers of a schedule of reasonable rates for water for private and public purposes for a further period of 20 years; third, that the decision of any three of the appraisers should be binding as to the questions submitted to them for determination; fourth, for the submission to the electors of the city, at a single special election, of the questions (a) whether the city should purchase the property at the value fixed by such appraisement, and (b) whether a new contract or franchise should be granted to the water company for a further period of 20 years on the basis of the rates fixed by the

appraisers; fifth, for carrying into effect either of said propositions if approved by the electors; and, sixth, that if the electors should *"refuse to accept either proposition"* no prejudice should result to the rights of either party under the ordinance of 1890, but such rights should remain as if the ordinance of 1907 had not been adopted or accepted. That ordinance recited that the water company would agree with the city to put in new temporary rates to be charged private consumers of water after November 1, 1907, for the remainder of the term specified in the then existing contract or ordinance of 1890, "in the event that the city . . . shall *not* at said election . . . *determine to purchase said plant or to extend or renew said contract* for a further period of twenty years."

March 20, 1909, the appraisers, acting under the ordinance of 1907, appraised the property at $14,400,000, but they failed to fix the schedule of rates which was to be a part of the proposition to renew the existing contract or franchise of 1890 for a further period of 20 years, and this failure operated, without fault on the part of the city or the water company, to prevent any further action under the ordinance of 1907, which called for the submission of both propositions at a single special election.

May 17, 1910, over a month after the expiration of the 20-year period specified in the ordinance of 1890, the people of the city amended its charter by adding a new section, known as § 264a. Briefly described, this amendment created a public utilities commission, named its first members and transferred to it the authority theretofore given to the board of public works as to all public utilities; particularly invested it with large powers in respect of the construction, acquisition, maintenance and operation of a water plant; declared that the city should never exercise any option to purchase such a plant, or to renew any contract with reference thereto, otherwise than through an approving vote of the qualified electors;

authorized the issuance of bonds in the sum of $8,000,000, if sanctioned by a vote of the taxpaying electors, to provide a municipal water plant; provided for the use, subject to the approving vote of such electors, of $7,000,000 of these bonds in the purchase of the plant of the water company, if it should, on or before July 1, 1910, elect to accept that sum, and for the use of the remaining $1,000,000 of bonds in improving, repairing and adding to the plant; and directed that, if the water company did not so elect, a special election should be held on the first Tuesday in September, 1910, to enable the taxpaying electors to vote upon the question of issuing the $8,000,000 of bonds for the purpose of constructing and putting into operation a municipal plant.

The water company did not elect to accept the $7,000,000 for its plant, and the city officers took the necessary preliminary steps to hold the special election called for by the charter amendment.

There was at no time an election by the city to purchase the water company's plant pursuant to the option reserved in § 11 of the ordinance of 1890, unless the ordinance of 1907, the charter amendment of 1910, or the failure to renew the contract or franchise pursuant to the option reserved in § 12 operated as such an election; and there was no election by the city to renew the contract or franchise pursuant to the latter option, unless the failure to exercise the other one was such an election.

The positions of the city and the water company in that regard came to be as follows: The city was insisting that the contract or franchise granted by the ordinance of 1890 was limited to 20 years in duration by the legislative charter in force when the ordinance was adopted; that the options reserved in §§ 11 and 12 of that ordinance were not alternative in the sense that one or the other must be exercised, but were independent in the sense that there was no obligation to exercise either; that neither·

was exercised, and therefore that, the 20-year limitation having expired, the contract or franchise was at an end. The water company, on the other hand, although not conceding the 20-year limitation, was insisting that the options were alternative in that the city was bound to exercise one or the other, that it had elected not to purchase the company's plant, and that in so doing it necessarily had elected and become obligated to renew the contract or franchise for another period of 20 years.

In this situation the trust company, being the trustee in a subsisting mortgage given in 1894 by the water company upon all of its property, including franchises, contracts, rentals and the right to receive the purchase price in the event of a purchase by the city, brought this suit against the city, certain of the city officers, the water company, and the South Platte Canal and Reservoir Company, a subsidiary of the latter holding the title to an important part of its property, to obtain a decree which should, among other things, declare that the city had elected and become obligated to purchase the property, direct a specific performance of that obligation and of the correlative obligation of the water company to sell, compel the payment of the purchase price to the trust company under the mortgage, and restrain and enjoin the city and its officers from meanwhile constructing a new municipal water plant, as also from taking any steps towards issuing bonds for that purpose. A cross-bill against the other defendants and the trust company was interposed by the water company, wherein it prayed, among other things, that its right to a renewed contract or franchise for another term of 20 years be established and that the city and its officers be directed to take such steps as might be necessary to effect the renewal. Upon applications submitted upon the bill, cross-bill and divers proofs the Circuit Court granted interlocutory orders, upon both bills, temporarily enjoining the city and its

officers from taking any steps towards the construction of a municipal water plant or issuing bonds for that purpose, and, in the instance of the cross-bill, from interfering with the water company in the exercise and enjoyment of the rights asserted by it under the contract or franchise of 1890. Appeals were taken to the Circuit Court of Appeals, where the interlocutory orders were affirmed, 187 Fed. Rep. 890, and the case is now here upon certiorari.

The exceptional power to review, upon certiorari, a decision of a Circuit Court of Appeals rendered on an appeal from an interlocutory order is intended to be and is sparingly exercised. But there can be no doubt that the power exists where no appeal would lie from a final decree of that court, as is the case where the suit is one in which the jurisdiction of the court of first instance depended entirely upon diverse citizenship. Judicial Code, §§ 128, 240; *American Construction Co.* v. *Jacksonville Co.*, 148 U. S. 372, 385; *Forsyth* v. *Hammond*, 166 U. S. 506. We think this is such a suit. The bill states that the trust company is a citizen of New York, that all the defendants are citizens of Colorado, and that "this is a controversy wholly between citizens of different States." True, it also alleges that the suit is one arising under the Constitution of the United States and attempts to support this general allegation by others referring to supposed and conjectured infractions of the contract and due process of law clauses of that instrument; but, when the true nature of the trust company's cause of action is considered, it is apparent that these allegations must be disregarded—some because they are without color of merit, and others because they are not a necessary part of the statement of that cause of action, but are in anticipation of defenses which it is thought the defendants may possibly interpose. See *Colorado Central Mining Co.* v. *Turck*, 150 U. S. 138, 143; *Tennessee* v. *Union & Planters' Bank*, 152 U. S. 454, 459; *New Orleans* v. *Benjamin*, 153 U. S. 411, 424; *Boston*

&c. *Mining Co.* v. *Montana Ore Co.,* 188 U. S. 632, 638, 639; *Defiance Water Co.* v. *Defiance,* 191 U. S. 184, 191; *Newburyport Water Co.* v. *Newburyport,* 193 U. S. 561, 576; *Devine* v. *Los Angeles,* 202 U. S. 313, 333; *Shulthis* v. *McDougal,* 225 U. S. 561, 569.

The gravamen of the trust company's cause of action is that the ordinance of 1890 restricted the city to a choice between two options, one to purchase the water plant and the other to renew the contract or franchise; that by the ordinance of 1907, and again by the charter amendment of 1910, the city made a binding election to purchase, which it now disregards and refuses to carry into effect; that the city is authorized by law to acquire a water plant by purchase or to construct one of its own, but not to do both; that, having elected and become obligated to purchase the existing plant, it is without authority to construct a new one; that the water company erroneously maintains that it is entitled to a renewal of the existing contract or franchise, and wrongfully refuses to insist upon a purchase by the city; and that in this situation the trust company is entitled, in virtue of its mortgage, to enforce the city's election and obligation to purchase and meanwhile to have the city enjoined from placing an obstacle in the way of the purchase by constructing a new plant. It is not asserted that the contract or franchise of 1890 was exclusive or contained any stipulation restraining the city from constructing and operating a plant of its own, or that the trust company is a property holder or taxpayer of the city; and so, the company can have no legal concern with what is done by the city in the premises, if only it performs its alleged obligation to purchase. It hardly needs statement that a suit to enforce such a cause of action is not one arising under the Constitution of the United States. "As has been stated, the rule is a reasonable and just one that the complainant in the first instance shall be confined to a statement of his cause of

action, leaving to the defendant to set up in his answer what his defense is, and, if anything more than a denial of plaintiff's cause of action, imposing upon the defendant the burden of proving such defense.", *Joy* v. *St. Louis,* 201 U. S. 332, 341.

But if we go beyond the trust company's statement of its cause of action and consider the attitude which it attributes to the city the result is still the same, for the bill expressly shows that the city puts its refusal to purchase upon the ground that it was not restricted by the ordinance of 1890 to a choice between the two options but left free to exercise either or neither; that it did not, by the ordinance of 1907, the charter amendment of 1910, or otherwise, exercise the option to purchase; and therefore that it has incurred no obligation in that regard. In other words, the bill discloses that the city's position is, that the trust company's claim is refuted by the very ordinances and charter amendment which are relied upon to sustain it. Of course, if this were the city's defense the controversy would be solved by merely ascertaining the proper construction of the ordinances and charter amendment, and there would be no occasion to consider the Constitution of the United States at all.

That the cross-bill may be broader than the original and seek relief on a Federal ground does not affect the question of the Circuit Court's jurisdiction, for a cross-bill is a mere auxiliary or dependency of the original and is entertained and disposed of in the exercise of the jurisdiction invoked by the latter. *Ayres* v. *Carver,* 17 How. 591, 595; *Ex parte Railroad,* 95 U. S. 221, 225; *Rouse* v. *Letcher,* 156 U. S. 47, 50; *Shulthis* v. *McDougal,* 225 U. S. 561, 568.

It follows that the jurisdiction of the Circuit Court depended entirely upon diverse citizenship, and therefore that the suit is one in which no appeal would lie from a final decree of the Circuit Court of Appeals.

We come, then, to the objections made to the orders
granting the temporary injunctions, and as these objec-
tions are addressed, not merely to the injunctions, but to
the merits of both the bill and the cross-bill, it is well to
observe at the outset that our power of review, like that
of the Circuit Court of Appeals, is not confined to the act
of granting the injunctions, but extends as well to deter-
mining whether there is any insuperable objection, in
point of jurisdiction or merits, to the maintenance of
either bill, and, if so, to directing a final decree dismissing
it. *Smith* v. *Vulcan Iron Works,* 165 U. S. 518, 525;
*Mast, Foos & Co.* v. *Stover Manufacturing Co.,* 177 U. S.
485, 494; *Harriman* v. *Northern Securities Co.,* 197 U. S.
244, 287; *United States Fidelity & Guaranty Co.* v. *Bray,*
225 U. S. 205, 214.

Whether the trust company is merely an assignee seeking
to recover the contents of a chose in action, and whether
its interest in the litigation is so far identical and in accord
with that of the water company as to require that they be
aligned on the same side, are questions upon which the
record is not entirely clear, and it therefore will be as-
sumed, as is expressly or impliedly affirmed by both com-
panies, that these questions should be resolved favorably
to the jurisdiction of the Circuit Court. See act August 13,
1888, 25 Stat. 433, c. 866, § 1; *Dawson* v. *Columbia Trust
Co.,* 197 U. S. 178, 181; *Shoecraft* v. *Bloxam,* 124 U. S. 730,
735.

What is the proper construction of the ordinance of
1890? Was the contract or franchise granted by it limited
to 20 years? Did the city obligate itself thereby to pur-
chase the plant or to renew the contract or franchise at the
end of that period, or did it merely reserve the privilege of
doing one or the other or neither, as to it should seem best
at the time? These are the questions which must first be
considered. It is not asserted that the ordinance granted
an exclusive franchise or restrained the city from con-

structing a plant of its own, nor would such an assertion, ·if made, have any support in the terms of the ordinance. But it is said that no time was fixed for the duration of the franchise. This may be taken as true so far as· the actual terms of the ordinance are concerned, although it ought not to be overlooked that it contained some recognition of a limitation elsewhere imposed, for the granting clause was qualified by the words "to such extent as the city may lawfully grant the same," and §§ 11 and 12, before set forth, proceeded as if the period would be 20 years. But the term of the franchise was not left undefined or in doubt, for the charter of the city explicitly declared that "all franchises and privileges" granted by it should "be limited to twenty years from the granting of the same," and the context made it perfectly plain that this limitation was intended to apply to rights to occupy and use the streets, alleys. and public places of the city such as were granted in this instance. The limitation became a part of the ordinance quite as much as if written into it. No doubt it was intended that the franchise should endure for the full period of 20 years. The qualifying words in the granting clause and the reference to that period in §§ 11 and 12 leave no doubt of this, but it was not intended, because it could not be, that it should endure longer. True, some of the provisions in §§ 19 and 20, if taken by themselves, might possibly make for a different conclusion, but they must be read with other parts of the ordinance, and all must be read with and subordinated to the charter limitation.

The principal controversy is over the purpose and effect of §§ 11 and 12 of that ordinance. As before shown, § 11 states that at the expiration of the period of 20 years the plant "may be purchased" by the city, if it "shall then elect so to do," and § 12 says that at the expiration of that period, the city "may, at its election, renew the contract hereby made," with a reduction of 10 per cent. in the

rental for hydrants. The word "contract" is used here, as elsewhere in the ordinance, as inclusive of the franchise to occupy and use the streets. Each section reserves or gives to the city a pure option. Under one it may purchase the plant, if it so elects, and under the other it may, at its election, renew the contract; but neither imposes any duty or obligation upon it, unless it exercises the privilege therein given. Such is the natural import of the terms employed, and they are plain and unequivocal. But it is said that the presence of the two options imposes on the city the duty of accepting one. Indeed, it is said in support of the bill that a failure to renew is an election to purchase, and in support of the cross-bill that a failure to purchase is an election to renew. We are clearly of opinion that these claims are ill-founded. In the absence of some stipulations to that end the city would be under no obligation to purchase or to renew, nor would it be entitled to do either. There is no stipulation purporting to impose such an obligation. All that is done is to reserve or give to the city the right to purchase or to renew, if it so elects. In other words, it is given a privilege to do either, but with no obligation to exercise it. Its situation is not unlike that of one who has sold real property, with a reserved privilege of repurchasing it or of taking a lease upon it after the expiration of a term of years. Although entitled to avail himself of either phase of the privilege, he is free to reject both.

As suggesting that the purpose of §§ 11 and 12 is different from what we hold it to be, we are referred to an ordinance of December 15, 1894, leasing to the water company a water plant formerly owned by the town of South Denver and acquired by the city through the annexation of that town. At most this ordinance has only an indirect bearing here, and the inferences drawn from it by counsel, even if justified, are quite inadequate to overcome the plain and unequivocal terms of those sections.

Whether, consistently with the powers conferred and the limitations imposed by the city charter then in force, the city could have bound itself, when the ordinance of 1890 was adopted, to purchase the plant or to renew the franchise at the expiration of the 20-year period is a question extensively discussed by counsel; but as we are fully persuaded that there was no attempt or purpose to create such an obligation by that ordinance, the point may be passed without further notice.

The trust company relies upon the ordinance of 1907 as showing an election by the city to purchase, or at least to purchase if the franchise was not renewed. That ordinance, we have seen, provided for an appraisement of the water company's property in advance of the expiration of the existing franchise, for the fixing of a reasonable schedule of rates to be charged during a further period of 20 years, and for submitting to the electors of the city, at a single special election, the questions (a) whether the city should purchase at the appraisement, and (b) whether a new franchise should be granted to the water company for a further period of 20 years on the basis of the rates so fixed. The appraisers chosen for the purpose made an appraisement but failed to fix the schedule of rates, and so, without any fault of the city or the water company, nothing further was done under that ordinance. It did not purport to make an election to purchase or to renew, either conditionally or otherwise. On the contrary, it affirmatively contemplated that the election, if any, was to be by the electors of the city, and that they might reject both propositions. Besides, Article 20, § 4, of the state constitution then in force provided that no franchise relating to the streets of the city should be granted except upon a vote of the electors, and Article 9 of the city charter then in force made a like vote a prerequisite to the acquisition by the city of any public utility. So, had the council attempted by the ordinance of 1907 to make an

election to purchase or to renew, the attempt would have gone for nothing. No doubt, the difficulty arising from the failure to fix a schedule of rates could have been adjusted between the city and the water company and the two propositions (the second in a modified form) submitted to the electors at an election called through a new ordinance. But this was not done, possibly because, as the record discloses, both parties were dissatisfied with the appraisement, the city claiming that it proceeded upon erroneous principles and was grossly excessive and the water company that it was inadequate and insufficient. But, however this may have been, it is plain that the ordinance of 1907 was not an election to purchase, either conditionally or at all.

The trust company also relies upon the charter amendment of May 17, 1910, § 264a, as showing an election to purchase under the option reserved in the ordinance of 1890. The amendment did not contemplate a purchase in accordance with that option, but independently of it and upon altogether different terms. Instead, therefore, of being an exercise of the option, it was a rejection of it. *Minneapolis & St. Louis Railway Co.* v. *Columbus Rolling Mill*, 119 U. S. 149, 151.

The Circuit Court of Appeals, having stated the conflicting claims of the trust company and the water company, the one that the city had elected to purchase, and the other that it had elected to renew, said: "The facts are stated upon which these claims are based, and it does not appear to us that the city has done either." With that conclusion we fully agree. In so far, then, as the bill and cross-bill are founded upon the contractual relations claimed to have arisen out of the ordinance of 1890, they must fail, and as the bill has no other basis it manifestly cannot be maintained.

As an additional ground for enjoining the issuing of bonds and the construction of a municipal water plant

under-the charter amendment, § 264a, the cross-bill, after stating that the water company is a large property holder and taxpayer of the city and must share in the burdens which will be placed upon all its property holders and taxpayers by issuing the bonds and constructing the municipal plant, challenges the validity of the amendment, and therefore the authority of the city to carry it into effect. It remains to consider the objections upon, which this challenge is rested.

Two objections named in the cross-bill are, that Article 20 of the state constitution (adopted as an amendment in 1902), upon which the charter amendment is based, (a) is repugnant to Article IV, § 4 of the Constitution of the United States guaranteeing to the State a republican form of government, in that it takes from the state legislature and vests directly in the people of the city legislative power over all subjects of purely municipal concern, and (b) is repugnant to § 2 of Article 2, § 1 of Article 5, and § 2 of Article 19 of the state constitution. These objections are not now insisted upon, the first doubtless because it is deemed sufficiently covered and disposed of, as undoubtedly it is, by our recent decision in *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118, and the second because it appears to be foreclosed by decisions of the Supreme Court of the State, in *People* v. *Sours*, 31 Colorado, 369, and other cases. Both may therefore be passed without further notice.

The next objection invokes the due process of law clause of the Fourteenth Amendment to the Constitution of the United States, and is, that the charter amendment subjects the water company to the alternative of accepting an inadequate price for its plant or of having its value ruinously impaired by the construction and operation of a municipal plant, and that this amounts to an unlawful deprivation of property. The objection is faulty in that it fails to recognize the real situation to which the

charter amendment applies. The water company, although .the undoubted owner of the physical property constituting its plant, is without a franchise to maintain and operate it through the streets of the city, the prior franchise having expired; and the city not only is under no legal obligation to renew the franchise or to purchase the plant, but is free to construct and operate a plant of its own. How then, can it be said that the proposal, expressed in .the amendment, to purchase the company's plant at $7,000,000 and to devote $1,000,000 more to its betterment, or else to construct a new one at a cost of $8,000,000, involves an unlawful deprivation of property or any right? See *Madera Water Works* v. *Madera*, 228 U. S. 454; *Detroit United Railway* v. *Detroit*, *ante*, p. 39. Whether $7,000,000 is an adequate price for the company's plant, and whether its value will be ruinously impaired by the construction of a municipal plant, are beside the question. Being under no obligation to purchase, the city is free to name its own terms, and the water company is likewise free to accept or reject them. The latter is under no compulsion other than such as inheres in the nature of its property or arises from a proper regard for its own interests. That the city, mindful of its interests, offered $7,000,000 for the water company's plant, when it could have proceeded to the construction of a new plant of its own, without making any offer to the company, affords no ground for complaint by the latter. *Newburyport Water Co.* v. *Newburyport*, 193 U. S. 561, 577.

Another objection invokes the equal protection clause of the Fourteenth Amendment and is, that the charter amendment singles out and deals with the subject of a water supply and with the plant of the water company, leaving all other public utilities to be dealt with under general charter provisions, and also cuts off all opportunity to obtain future franchises to occupy and use the streets

for the purpose of supplying water to the city and its inhabitants, while leaving full opportunity to obtain such franchises for other purposes, such as supplying light, heat, power, transportation, or telephone service. There is no merit in this objection. The equal protection clause is directed only against arbitrary discrimination, that is, such as is without any reasonable basis. *Lindsley* v. *Natural Carbonic Acid Gas Co.*, 220 U. S. 61, 78. It does not prevent a city from applying the scheme of municipal ownership and maintenance to one public utility without applying it to all; nor does it prevent a city, owning and maintaining a municipal water plant, from refusing to grant franchises which will bring privately owned plants into competition with its own. There is nothing unequal in this in the sense of that clause. And if it was essential that there be a reasonable basis for dealing specially and directly, as was done, with the question of purchasing the company's plant, the situation before recited shows that such a basis was not wanting.

Article 20 of the state constitution, under which the present home-rule charter was adopted, while investing the people of the city (§ 4) with "exclusive power in the making, altering, revising, or amending their charter," makes a distinction (§ 5) between the modes of amending it and of revising it *in extenso* or making a new one, the difference being that an amendment may be initiated by petition and directly voted upon and adopted by the electors, while a revised or new charter requires the intervention of a charter convention. Relying upon this, it is objected that § 264a, now under consideration, is not an amendment but partakes of the nature of a revised or new charter, and is invalid because, as is the fact, it was not framed and approved by a charter convention before being submitted to the electors. The point cannot be sustained. The section is in form and in substance a mere amendment. It does not alter the form of the city government or make

extensive changes in the existing charter, but is confined
to matters pertaining to public utilities, more especially
the acquisition, maintenance and operation of a municipal
water plant. In the briefs some reference is made to
*Speer* v. *People*, 52 Colorado, 325, where the Supreme
Court of the State recently had before it a proposed
amendment radically and extensively changing the form
of the city government. The opinions rendered in the
case disclose some differences of opinion upon the question
whether what was proposed could be regarded as a mere
amendment, but the question was not decided and nothing
was said in the opinions that tends to sustain the objection
now made to § 264a.

Another objection urged against that section is, that it
is in conflict with Article 20, § 4, of the state constitution
in that, while that article provides that the question of
granting a desired franchise shall be submitted to the
electors upon the deposit with the city treasurer of the
expense of the submission, § 264a prevents the granting
of any franchise for the purpose of furnishing a supply of
water. Assuming that § 264a does do this, it is done as
part of the plan of establishing and maintaining a munic-
ipal water plant expressly authorized by Article 20, § 1.
Besides, the provision in Article 20, § 4, which is relied
upon, is a subordinate part of a limitation or restriction
to the effect that no franchise to occupy or use the streets
of the city shall be granted except upon an approving vote
of the electors, and is evidently intended to be merely
regulatory of the payment of the expense of taking the
vote, and not to make such payment the only test of the
right to have the vote taken.

Finally, it is objected that the submission and adoption
of § 264a were in contravention of the existing charter,
(a) because the section deals with several independent
and unrelated subjects, (b) because it designates the first
members of the public utilities commission, instead of

leaving them to be elected in accordance with the general provision in § 178 of the charter, and (c) because it prescribes a different mode of acquiring a municipal water plant than that provided in Article 9 of the charter. In disposing of a preceding objection, we have held that § 264a was merely an amendment of the charter, and that the mode of its submission and adoption was in accord with the applicable restrictions of the state constitution. No additional restrictions were prescribed by the charter, its only provision upon the subject being (§ 20), "Any measure, charter amendment, or proposal for a charter convention, may be submitted to a vote of the qualified electors in the manner provided by the constitution." In passing upon the preceding objection, therefore, we have passed upon the first branch of the one just stated; but it may be added that we think all the provisions of the amendment have such a relation to the principal subject, namely, the public utilities of the city, as to permit their inclusion in a single amendment. Of the other two branches of this objection it is enough to say that the amendment supersedes *pro tanto* the original provisions of the charter with which it is not in accord. The purpose in adopting it was to introduce something new, to make a change in existing provisions, and being adopted conformably to the constitutional and charter requirements, the new or changed provisions became at once a part of the charter, thereby supplanting or modifying the original provisions to the extent of any conflict.

Having now considered all the claims advanced in support of the cross-bill and finding, as we do, that it has no support in any of them, it follows that, like the original bill, it cannot be maintained. The interlocutory decrees of the Circuit Court of Appeals and the Circuit Court are accordingly reversed, and the case is remanded with a direction to dismiss both bills on the merits.

*Reversed.*