COLUMBUS RY., POWER & LIGHT CO. v. CITY OF COLUMBUS, OHIO, et al.

(District Court, S. D. Ohio, E. D. September 20, 1918.)

No. 104.

1. MUNICIPAL CORPORATIONS ⬤⟶680, 681(7)—STATUTORY POWERS—CONTRACTS WITH STREET RAILROADS.

Gen. Code Ohio, §§ 3768–3777, 9101–9139, as construed by both state and federal courts, confer on municipal corporations full power to enter into contracts for the maintenance and operation of street railway lines.

2. CARRIERS ⬤⟶12(9)—CHARGES—FRANCHISE—REGULATION.

A municipal ordinance, passed under statutory authority, granting a franchise for a stated term to a street railroad company, and fixing a rate of fare to endure during that term, when accepted by the company, creates a contract mutually binding and unalterable during the term, except by consent of both parties.

3. CARRIERS ⬤⟶1—POWER TO REGULATE—REGULATION—STREET RAILWAY FARES—CONTRACTS RESPECTING RATES.

The Legislature of a state may, unless restrained by the state Constitution, contract away its power to regulate the rates of fare of a street railroad company, either by an enactment of its own, or by delegating to the municipality the power to do so.

4. CONSTITUTIONAL LAW ⬤⟶278(7)—CONTRACTS—STREET RAILWAY FRANCHISE.

The courts cannot relieve a street railroad company from performance of a valid franchise contract by which it agreed to operate its road at a fixed rate of fare, on the ground that because of changed conditions such operation would be at a loss, and the company would be deprived of its property without due process of law.

5. COURTS ⬤⟶280—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

When no real or colorable, but only a fraudulent and fictitious, federal question is stated, the jurisdiction of a federal court does not attach for any purpose, and it is duty of court of its motion to refrain from exercising jurisdiction.

6. COURTS ⬤⟶282(1)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

Even when a threatened act may be an impairment of a contract or a deprivation of property without due process of law, still, if the only means threatened to be used are resort to the courts or legal proceedings, a case is not stated within the jurisdiction of a federal court as involving a constitutional question.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Columbus Railway, Power & Light Company against the City of Columbus, Ohio, George J. Karb, Mayor, and others. On motion by complainant for preliminary injunction, and by defendants to dismiss. Injunction denied, and bill dismissed.

Henderson & Burr, of Columbus, Ohio, for plaintiff.

Henry L. Scarlett, City Atty., of Columbus, Ohio, for defendants.

WESTENHAVER, District Judge. This cause has been heard and submitted on complainant's application for a preliminary injunction, based on its verified bill and affidavits, and on defendants' motion to dismiss for want of jurisdiction, and because a valid cause of action in equity is not stated. These respective motions have been elaborately argued, both orally and by briefs. Due consideration has been given to the many authorities cited and the several contentions made, but this opinion will deal only with such as seem to me vital and controlling.

The complainant is a corporation organized under the laws of the state of Ohio. The defendant, the city of Columbus, is a municipal corporation of the state of Ohio, and the other defendants are its mayor, members of its council, and other city officials. Complainant owns and operates a system of street railways within the city of Columbus, and is engaged in manufacturing and selling heat, light, and power to the inhabitants of the city and to industrial plants therein and adjacent thereto.

Complainant's street railway lines have been constructed, maintained, and operated by virtue of certain grants or franchises. These are embodied in two ordinances duly enacted by the proper authority of the city of Columbus. The principal franchise, called the "blanket franchise," is Ordinance No. 17801, passed February 4, 1901; and the other, called the "Central Market franchise," is Ordinance No. 17802, passed January 21, 1901. In addition, complainant claims to own a perpetual franchise on certain streets; but the provisions thereof are not material to any question now to be decided. Both franchises are for terms of 25 years and will not expire, by their terms, earlier than the year 1926. They require the grantee to carry passengers for a single cash fare of 5 cents and to sell tickets in packages of 8 for 25 cents, and to give universal free transfers upon the payment of a 5-cent fare or the presentation of one of these tickets.

Complainant's bill alleges, and the supporting affidavits clearly show, that the cost of operating these street railway lines has greatly increased during the present war, owing to the rise in price of coal, materials, supplies, and labor. As a result of this increased cost, the net earnings from the operation of the street railway line for the year ending June 30, 1918, after deducting taxes, operating expenses, and a proper charge for depreciation, were only $301,987. These earnings are insufficient by the sum of $31,000 to pay interest on outstanding bonds, and are sufficient to allow a net return of only 4½ per cent. on the actual value of the capital invested in the street railway system. The value of this property, it is alleged, is $12,000,000, and the par value of the bonds issued and outstanding is $7,225,000.

In June, 1918, complainant's street railway employés demanded an increase in wages, and, in order to avoid a strike, the controversy between the complainant and its employés was submitted to the National War Labor Board for decision. This board, on July 31, 1918, made an award granting to the employés an average increase of 50 per cent. in the rate of wages hitherto being paid. Complainant abided by this decision and granted the increase thus awarded. The amount of this increase, it is estimated, will be for the ensuing year $560,000, and as a result thereof it is estimated that the gross earnings will fall short of paying operating expenses, taxes, and a proper allowance for depreciation by approximately $250,000. This leaves no net income, either to pay interest on outstanding bonds or dividends on capital actually invested.

Complainant alleges that these facts were twice brought to the attention of the city council of defendant, and request made for permission to increase the rate of fare above that fixed by these franchise grants, so as to permit the earning of a reasonable return on the invested capital. This request being either denied or ignored, complainant on August 20, .1918, filed with defendants a communication in writing, stating that it would henceforth discontinue the selling of 8 tickets for 25 cents and the giving of universal transfers, and that it surrendered, relinquished, and canceled its two franchises; that it would no longer operate cars thereunder; that it would thereafter consider itself a tenant by sufferance only on the streets, and would withdraw therefrom whenever notified so to do by the city, but that until so notified, and in order not to deprive the traveling public of service, it would continue to operate its lines, not under these franchises, or either of them, but at a rate of fare to be fixed by itself. It thereupon fixed the rate at 5 cents for cash fare and made a charge of 1 cent for each transfer to be issued, discontinuing the sale of 8 tickets for a quarter and free transfers. This rate thus established has been in force since August 20, 1918.

On the same day as this communication in writing was filed, the bill herein was also filed. This bill, as well as the amended bill filed September 3, 1918, states that the defendants threaten, and will, unless restrained, attempt to force complainant, to continue to operate these street railway lines in accordance with the terms of these two franchise grants. The nature of the threats made and the means to which it is expected the city will resort to enforce its threats are not stated or shown.

Complainant's bill also alleges and shows that, in addition to its street railway business, it is engaged in manufacturing and selling electricity for heat, light, and power. The capital invested therein, the earnings thereof, and the franchise rights are not disclosed. The city of Columbus and its suburbs, it is alleged, contain a population of more than 250,000; that it is a large industrial manufacturing center, in which are situated shops, factories, and plants; that many of these persons and plants are employed in the making of various kinds of munitions and war materials necessary to the prosecution of the war; that within the territory served by complainant's

street railway lines, and by its heat, light, and power, is located a military barracks, in which are quartered more than 100,000 recruits per annum. All these, it is said, are dependent upon the street railway service, and on the heat, light, and power furnished by complainant. The discontinuance or impairment of this service would cause great harm to the government of the United States, to the people of the city of Columbus, and to all persons dependent thereon.

Complainant's amended bill alleges, and the supporting affidavits show, that it has in progress a plan to enlarge its heat, light, and power business, and that it is necessary to buy and install new equipment for this purpose, and that, in order so to do, it is necessary to raise new capital, which it is unable to do because of the low rates of fare fixed for street railway service.

Such in substance and in brief is the case made upon which the jurisdiction of this court is invoked and a preliminary injunction is asked. Complainant urges that any action of the city or its officials compelling the continuance of street railway service on the terms of these franchises at less than cost, or at a loss, is depriving it of its property without due process of law, in violation of the due process clause of the Fourteenth Amendment. This position is supported by two lines of argument. One is that the fare provisions of these franchises amount only to a legislative fixing of a rate of fare for transportation service, and cannot be enforced when conditions have so changed that this rate of fare does not yield a fair return on the capital actually invested. Another is that, even if these franchises were mutually binding contracts when entered into, they are no longer enforceable because of the conditions produced by a state of war. From these positions it is argued that complainant has the right to treat these franchise contracts as terminated, and having, by its communication in writing to the city, so declared, it becomes and is thereafter a tenant by sufferance only in the streets, subject to ejection at will by the city, but that, while the city refrains from so ejecting it and permits street railway service to be given, complainant has the right to insist upon a rate of fare which will yield a fair return on the capital actually invested, and that any effort of the city to compel service on terms which will deprive it of this fair return is depriving complainant of its property without due process of law. It is, of course, insisted that the 5-cent straight fare, with a charge of 1 cent for transfer, is the rate necessary to yield that fair return on the capital actually invested, and is therefore a reasonable rate.

Defendants urge that the averments of the bill do not present a real and colorable, but only a fictitious and fraudulent, federal question, under the due process of law clause of the Fourteenth Amendment, and that, therefore, inasmuch as there is no diversity of citizenship, this bill should be dismissed for want of jurisdiction, and, further, that the bill does not state a valid cause of action in equity, such as entitles complainant to any relief.

[1] The primary and controlling question, in my opinion, depends on the nature of the relation created between the complainant and the city by these franchise grants. This relation is settled beyond con-

troversy by numerous decisions of the Supreme Court of Ohio and of the Supreme Court of the United States. The statute law of Ohio in force when these ordinances were passed were sections 2501, 2502, 2504, 2505, 2505b, 3443, 3443—12, Bates' Annotated Statutes of Ohio. They are copied in full in the margin in Cleveland v. Cleveland City Ry. Co., 194 U. S. 531–534, 24 Sup. Ct. 756, 48 L. Ed. 1102. These sections, slightly different only in phraseology, are now sections 3768 to 3777 and 9101 to 9139 of the Ohio General Code. Cases construing these sections, and defining the rights and burdens created by franchise ordinances, such as are now under consideration, are the following: Railway Co. v. Village of Carthage, 36 Ohio St. 631, 634; City of Columbus v. Street R. R. Co., 45 Ohio St. 98, 12 N. E. 651; Interurban Co. v. Cincinnati, 93 Ohio St. 109, 112 N. E. 186; Cleveland v. Cleveland City Railway Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102; Cleveland v. Cleveland Electric Ry. Co., 201 U. S. 529, 26 Sup. Ct. 513, 50 L. Ed. 854; Cleveland Electric Railway Co. v. Cleveland, 204 U. S. 116, 27 Sup. Ct. 202, 51 L. Ed. 399.

[2] The holding of all these cases is uniform. Of them the leading one is Cleveland v. Cleveland City Railway Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102. The law as settled by these cases is that the Legislature has by these sections delegated to municipal corporations full power and authority to enter into contracts for the maintenance and operation of street railway lines; that whatever the city in fact does pursuant thereto is the act of the state and is mutually binding upon the parties. Franchise grants for fixed terms not exceeding 25 years, and for a fixed rate of fare to continue during the term of such grants, may lawfully be made by the city under this legislative delegation of power. If the city passes an ordinance purporting to grant a franchise for a fixed term, with a rate of fare to endure during that term, and this ordinance is accepted, expressly or impliedly, a contract is engendered mutually binding and unalterable, except by the consent of both parties, during the term thereof.

In Cleveland v. Cleveland City Railway Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, all these rules are fully stated and upheld. The question there was whether or not the ordinances under consideration had in fact created a contract at a fixed rate of fare for a definite term, thereby extinguishing a right reserved to the city in earlier ordinances of increasing or diminishing the rate of fare. Mr. Justice White, delivering the opinion, says (194 U. S. 536, 24 Sup. Ct. 763, 48 L. Ed. 1102):

"In reason, the conclusion that contracts were engendered would seem to result from the fact that the provisions as to rates of fare were fixed in ordinances for a stated time, and no reservation was made of a right to alter; that by those ordinances existing rights of the corporation were surrendered, benefits were conferred upon the public, and obligations were imposed upon the corporations to continue those benefits during the stipulated time. When, in addition, we consider the specific reference to limitations of time which the ordinances contained, and the fact that a written acceptance by the corporations of the ordinances was required, we can see no escape from the conclusion that the ordinances were intended to be agreements binding upon both parties definitely fixing the rates of fare which might be thereafter charged. Taking all the circumstances above referred to into

account, the case before us clearly falls within the rule as to the binding character of agreements respecting rates applied in Detroit v. Detroit Citizens' Street Railway Company, 184 U. S. 368 [22 Sup. Ct. 410, 46 L. Ed. 592], and approvingly referred to in Knoxville Water Co. v. Knoxville, 189 U. S. 434, 437 [23 Sup. Ct. 531, 47 L. Ed. 887]."

The other cases are equally in point, and, inasmuch as no conflict exists therein, a review of them is unnecessary. Numerous cases illustrating and applying the same rule are contained in the United States Supreme Court Reports arising under municipal ordinances of other states. A citation of them is for the same reasons superfluous.

[3] Complainant's further contention that the fare provision of these franchises is only a legislative regulation of the charge for service is also shown by these authorities to be untenable. There are cited, in support of this contention, Milwaukee Electric Railway Co. v. Wisconsin Railroad Commission, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254, and other kindred cases. These cases establish a different principle and belong to a different class. The right to regulate the charges for a public service is, as shown by these cases, a governmental function, and a municipality has not the power by contract to deprive a state of that power, unless expressly authorized so to do. In determining whether or not a state, through its agent, a municipality, has authorized and permitted this governmental power to be contracted away, all doubts will be resolved in favor of the public and against the alleged surrender of power. No question is made but that the Legislature of a state may, unless restrained by state Constitution, contract away this power, either by an enactment of its own or by delegating to the municipality power so to do. The Milwaukee Case only holds that, applying these principles, it did not clearly and unmistakably appear that the state had contracted away this function of the government, or had delegated to the municipality the power to contract it away.

The cases already cited show that as regards Ohio the state has delegated to municipalities full power to make a binding contract fixing for a definite term the rate to be charged for this service, and has thereby disabled the municipality, if not itself, from altering or changing that rate during the fixed term. The law of Ohio is, as was said by Mr. Justice White, of the same kind as that of Michigan and Indiana. See City Railway Co. v. Citizens' Street Railroad Co., 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114; Detroit v. Detroit Citizens' Street Railway Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592.

No question is made but that the franchise grants now being considered did by their terms purport to create a binding contract as to the rate of fare for a term of 25 years. It follows from this settled law that a contract has been engendered, mutually binding upon the city and upon the owner of these franchises, that this contract requires the owner during the entire term of 25 years to furnish street railway service at the rates of fare therein provided, and that neither the complainant nor the city during this term has the right to change or alter that rate without the consent of the other.

The impairment of contract and the due process of law clauses of the Constitution have often been invoked to prevent cities from im-

pairing franchise grants, or forcing a reduction in the contract rate, and the courts have uniformly, despite all criticism, sustained and upheld them, and, in so doing, have vindicated the law. It is equally the duty of the courts to uphold these contracts and vindicate the law when it is the grantee therein, and not the city, which is seeking to change the terms thereof without the consent of the other party. It is of primary importance that contracts should be upheld by the courts, for the right to contract and the binding obligation of contracts once made lie at the foundation of all public and municipal law.

This proposition is really controlling of all questions argued, but a brief consideration of some other questions should, perhaps, also be made.

[4] One proposition strongly urged is that a steam or street railway cannot be compelled by injunction or mandamus to operate all or a part of its system at a loss, and that any effort so to do is depriving it of its property without due process of law. In its final analysis, this proposition means that courts will not enforce a valid and binding contract, if so to do will inflict loss upon one of the contracting parties. Manifestly the proposition, when thus baldly stated, will not be contended for. Obviously, then, the cases cited in which courts have refused to grant an injunction or a mandamus to compel the operation of all or a part of an unprofitable steam or street railway system turns upon different facts from those here present.

Briefly, and without reviewing at length the many cases cited, the law on this proposition, as I understand it, may be summed up as follows: If a railway company is under a statutory or a contract duty to maintain and operate a line, it will be compelled by injunction or mandamus so to do, even though the further operation should be at a loss. It is only when there is no valid or binding obligation to continue operation that the company may, at its discretion, abandon an unprofitable line or branch. If there is a binding obligation to maintain and operate a part of a system, it is questionable whether that part or branch can ever be abandoned, unless the losses inflicted by its continued operation are such as will wreck the entire system. On the other hand, if the operation of a railway line cannot be continued, owing to insolvency, a court will not by mandamus or otherwise try to compel its further operation; and this is particularly true, if its continued operation will perform no useful public service. This refusal of the courts to interfere does not proceed on the view that the company had a right to abandon the operation of an unprofitable system, or of an unprofitable branch. If there is a statutory or contract duty to maintain and operate, this obligation still remains in law, just as a debtor's obligation to pay his debts remains after he has become insolvent; but a court will not attempt to compel by mandamus or otherwise that which is manifestly futile and impossible, for a court has no means of providing capital to operate an insolvent railway company, or to continue its operation after it has become insolvent. This, it seems to me, is all that can be claimed for the statement found in some cases that a court will not compel a continued operation at a loss of a railway line or branch.

The true rule, with its limitations and exceptions, is, in my opinion, fully stated in Southern Railroad Co. v. Hatchett, 174 Ky. 463, 192 S. W. 694, L. R. A. 1917D, 1105, note L. R. A. 1915A, 549. Illustrating and supporting these statements and conclusions are the following: Northern Pacific Railroad Co. v. Washington Territory, 142 U. S. 493, 12 Sup. Ct. 283, 35 L. Ed. 1092; Interurban Co. v. Cincinnati, 93 Ohio St. 109, 112 N. E. 186; State ex rel. v. Black Diamond Co., 97 Ohio St. 24, 119 N. E. 195; Fort Loramie v. Gress (Ohio C. C. A., not reported); State ex rel. v. Bridgeton & M. T. Co., 62 N. J. Law, 592, 43 Atl. 715, 45 L. R. A. 837; State ex rel. v. Spokane Street Railway Co., 19 Wash. 518, 53 Pac. 719, 41 L. R. A. 515, 67 Am. St. Rep. 739; City of Potwin Place v. Topeka R. R. Co., 51 Kan. 609, 33 Pac. 309, 37 Am. St. Rep. 312; Paige v. Schenectady R. R. Co., 178 N. Y. 102, 70 N. E. 213.

These conditions are not present in this case. The complainant does not allege insolvency, or make any showing of inability to perform the terms of its contract. Its showing merely is that operation for the year ending June 30, 1918, yielded only 4½ per cent. net return on capital actually invested, after deducting operating expenses, taxes, and a reasonable allowance for depreciation, and that operation during the year ending June 30, 1919, at the increased wage schedule, will result in a loss of $250,000 on operation alone.

These statements, it will be noted, apply only to the street railway part of complainant's business. Furthermore, this is not an application by the city for a mandamus, or a mandatory injunction, to compel continued operation under present conditions, nor a suit to compel specific performance of a harsh and unconscionable bargain. Complainant here is seeking an injunction to protect it in a manifest and plain violation of its contract. Consequently the rules of law under which courts have refused to compel the operation of an unprofitable railway branch, or the performance of an unconscionable contract, have no pertinency.

Complainant further contends and urges that it has the right to end these franchise contracts because of new conditions, not foreseen when they were entered into; that is to say, the war and the increased cost of operation due to the war. In support of this proposition are cited the following: The Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960; Krell v. Henry, [1903] 2 K. B. 740; Metropolitan Water Board v. Dick, Kerr & Co., Appeal Cases, H. of L. 119, [1917] 2 K. B. 1; Liston et al. v. Owners of Steamship Carpathian, [1915] 2 K. B. 42, 112 Law Times Reports, 994.

In my opinion, neither the facts of these cases nor the rules of law announced therein have any application to this situation. The Kronprinzessin Cecilie involves no question, except whether its owners were excused on July 31, 1914, from continuing its journey to Bremerhaven, Germany, in view of the prospects of war and seizure. It was contended that, inasmuch as war had not been declared, and that perhaps the journey might have been completed without seizure, the contract of the vessel's owner to carry gold and deliver it in Europe might still have been possible of performance. It was not denied that actual

seizure as a result of war would have discharged the contract, because making it impossible of performance, and the court held that the imminence of such seizure was so apparent that due prudence justified the master of the vessel in returning to the United States.

In Krell v. Henry the parties had made a lease of windows overlooking the Pall Mall for June 26 and 27, 1902, when the King's coronation procession was to take place. Owing to illness, the coronation procession was postponed. It was held that, notwithstanding the lease did not refer to the specific use for which the premises were being hired, namely, to view the coronation procession, and did not provide for ending the contract if for any reason it did not take place, the parties had made the lease in view of the expected coronation procession, and that the unforeseen and unprovided-for contingency of its unavoidable postponement excused the lessee from payment. This case is of that class which holds that a destruction of the subject-matter of a contract, or of a basis mutually assumed by the parties when entering into it, puts an end to the respective obligations.

In Metropolitan Water Board v. Dick, Kerr & Co. a contractor had agreed to construct a part of a water system within six years, and, after beginning work thereon, his equipment and the site upon which he was to do the construction work was seized by the military authorities of Great Britain for war purposes. Obviously here was a vis major, rendering impossible the further performance of the contract into which the parties had entered. It was impossible to proceed further.

No such conditions are here present. The performance of these franchise contracts has not been made illegal nor rendered impossible by any superior power. War conditions, it is true, have made the performance of them more burdensome and expensive, so far as the facts now presented tend to show. The war has in a different degree, perhaps, affected the performance of many, if not the larger part, of outstanding and unexecuted contracts between citizens of the United States; yet it would be a strong proposition to say that all such contracts are thereby rendered void, or voidable, at the option of the losing party.

The increased cost to complainant of performing its franchise contracts differs only in degree and quality from that due to other economic causes prevailing since they were made. If the war or economic changes had decreased the price of coal, materials, supplies, and labor, it would not be urged upon any one that the city would have the right to declare null and void these contracts, or the fare provisions therein, and establish a new rate in accordance with new conditions; and if the city should take such a position, it would be met, and justly, with an injunction on the ground that such action impairs the obligation of a valid and binding contract.

In order to make applicable the principles of law urged in this connection, it would be necessary to show that war or military authority had directly interfered in such a manner as to make these contracts illegal or impossible of performance. Nothing less than the equivalent of actual seizure by military authority, or a direct and

forcible intervention, such as prevents further performance, would bring the case within the operation of these rules.

Complainant also invokes the rule announced in the majority opinion in Denver Union Water Co. v. Denver, 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649, decided by the United States Supreme Court March 4, 1918. That case, in my opinion, has no application. There the Denver Union Water Company had constructed and operated its plant under a franchise expiring in 1910, and thereafter, during a certain period, it remained a tenant by sufferance, with the right on its part to discontinue service and remove its pipes and hydrants from the streets, and with the right and power of the city at any time to compel the removal thereof. Later an ordinance was passed to regulate the terms and conditions, including charges, upon which the water company should continue to perform its public service. It was not held that the owner of a water system with an expired franchise, the property of which is subject to ejection at the will of the city, has a right to complain under the due process of law clause because the terms and conditions under which service is rendered in that situation does not yield a fair return on the capital invested. It was held that the so-called regulating ordinance granted a new franchise of indefinite duration, terminable either by the city or the company at such time and under such circumstances as may be consistent with the duty that was owing by both to the inhabitants of Denver, and while this new franchise of indefinite duration remained undetermined by the city, the water company was entitled to enjoin the rate fixed for service because not yielding a fair return on the capital actually invested. This, it was said, deprived the company of its property without due process of law. If the regulating ordinance had not been construed as granting a new franchise of indefinite duration, but had merely been one forbidding a charge higher than a certain rate during such time as the water company saw fit to leave its pipes and hydrants in the streets and perform service, the fair implication is, both from the majority and minority opinions and other cases previously decided, that no relief would have been accorded. See, also, Cleveland Electric Railway Co. v. Cleveland, 204 U. S. 116, 27 Sup. Ct. 202, 51 L. Ed. 399; Detroit United Railway v. Detroit, 229 U. S. 39, 33 Sup. Ct. 697, 57 L. Ed. 1056; Denver v. Denver Union Water Co., 229 U. S. 123, 33 Sup. Ct. 657, 57 L. Ed. 1101.

Complainant's franchise contracts, as already said, have not expired. It is not a tenant of the streets under a franchise contract of indefinite duration, much less a tenant merely by sufferance. It has not the right to remove its tracks at will, or to refuse to operate a street railway line. I am of opinion that the bill should be dismissed, because it does not state facts constituting a valid cause of action in equity.

[5] I am also of opinion that on the facts stated this court has no jurisdiction. There being no diversity of citizenship, jurisdiction is invoked only because of the due process of law clause of the Fourteenth Amendment. The facts stated in the bill show a valid and binding contract, from the force and effect of which complainant is

seeking to escape.  No threatened action of the city authorities is complained of, except that it may endeavor to enforce compliance by complainant with its contract.  No charge is made that other than legal methods will be adopted for that purpose, and, in the absence of a statement clearly showing a threatened resort to illegal means, a court must assume that the city officials will proceed in conformity to law.

[6] The law is well settled, as contended for by complainant, that if the facts stated make a real and colorable federal question, jurisdiction properly attaches, and will not be ousted, even if on the hearing the claim thus made is held to be without merit in law, or without foundation in fact.  On the other hand, when no real and colorable, but only a fraudulent and fictitious, federal question is stated, the jurisdiction of the court does not attach for any purpose, and it is the duty of a federal court of its motion to refrain from such an unwarranted exercise of jurisdiction.  And even when the threatened act may be an impairment of a contract, or a deprivation of property without due process of law, still if the only means threatened to be used are resort to the courts or to legal proceedings, a case is not stated within the jurisdiction of a federal court.  Such seems to me to be the present case.  For authority see the following:  Penn Mutual Life Insurance Co. v. Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626; St. Paul Gaslight Co. v. St. Paul, 181 U. S. 143, 21 Sup. Ct. 575, 45 L. Ed. 788; Defiance Water Co. v. Defiance, 191 U. S. 184, 24 Sup. Ct. 63, 48 L. Ed. 140; Barney v. New York, 193 U. S. 437, 24 Sup. Ct. 502, 48 L. Ed. 737; Des Moines v. Des Moines, etc., Railway Co., 214 U. S. 179, 29 Sup. Ct. 553, 53 L. Ed. 958.

The application for a preliminary injunction will be denied.  The motion to dismiss will be granted, both for want of jurisdiction and because no valid cause of action in equity is stated.

This opinion should perhaps be ended here, but the importance of the interests at stake moves me to make some further observations, in the hope that the apparently strained relations between the complainant and defendants may be ameliorated.  It cannot be denied, on the showing made, that the present war has greatly increased the cost of street railway operation.  The award of the National War Labor Board in the wage controversy cannot be regarded otherwise than binding on the company, and the increase of wages granted by the company pursuant thereto cannot, in any fair sense, be considered as its voluntary act.  It is also undoubtedly true, on the showing made, that complainant cannot, under existing conditions finance any improvements required to meet new demands for heat, light, and power, or for increased street railway facilities, and its failure so to do must injure the interests of the defendant and its inhabitants as much as it injures the complainant.

Prolonged operation under these conditions would seem to be a manifest impossibility, and must result in impairing the street railway service and grievously harming the people and business of the city.  These considerations do not, for the reasons already stated, present any ground upon which a court can grant relief, for it has power only to declare the law and apply it.  A sound public policy

forbids usurpation by the courts of governmental power lodged in other departments of the government. No power inheres ·in a court, either to make contracts for parties, or to absolve them from the effect of their contracts, provided the parties are competent in law to contract, and no fraud intervenes in the making thereof.

In view of these well-recognized limitations of the court's power, I can only suggest that the present emergency, likely as it is to become much graver in the near future, calls urgently for some kind of accommodation or temporary compromise between the parties. No intimation is made that blame attaches to either, much less that one more than the other is at fault, for it is undoubtedly true that the present situation is due to the rapid and unexpected evolution of uncontrollable events; but some kind of a modus vivendi fair to both, and to endure at least for the period of the war, should be agreed to, in order that loss to both may be prevented, and the public mind may not be distracted by a street railway war, when engrossed in the problems of a foreign war. If something is not done, no gift of prophecy is required to foresee that the recommendation of the National War Labor Board will be acted upon, namely, that the President of the United States, as Commander in Chief of its armed forces, by virtue of the powers inherent in his office and conferred by Congress, will seize and operate the street railway at rates yet to be fixed. Such a shifting of duty and of responsibility would not be creditable to the people of a self-governing city, nor to the business management of an efficient public service corporation.