NORTH AMERICAN CONST. CO. v. DES MOINES CITY RY. CO.

(District Court, S. D. Iowa, C. D.    March 18, 1919.)

1. FRANCHISES ⬦1—NATURE—"CONTRACT."
   A franchise is a contract.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract.]

2. CONTRACTS ⬦143—POWER OF COURT.
   A court cannot make a contract for individuals or corporations. nor modify one made by them, but only construe it.

3. CARRIERS ⬦12(9)—FARES—REGULATION—FRANCHISE.
   The franchise of the Des Moines City Railway Company, being definite as to rates for fares, without any provision as to change thereof, though providing for payment by company. from fares collected, of cost of operation, taxes, 5 per cent. on bonded indebtedness. and 6 per cent. on other indebtedness. and the setting aside of a depreciation fund, and also providing for "first-class" service, with persons, and, in case of their disagreement, arbitration. to determine the service to be rendered, there can, in case of insufficient income, be no increase of fares, but class of service must yield.

In Equity.    Suit by the North American Construction Company against the Des Moines City Railway Company.    On application of receivers for construction of franchise.    Opinion rendered.

---

Carr, Carr & Cox, of Des Moines, Iowa, for plaintiff.

W. H. McHenry and Sargent & Gamble, all of Des Moines, Iowa, and Wm. Chamberlain, of Cedar Rapids, Iowa, for defendant.

H. W. Byers, of Des Moines, Iowa, for intervener.

WADE, District Judge. [1] A franchise is a contract. There is no question about the authority of the city to make a contract with the street railway company for service, and for rates to be charged for such service. There is some doubt as to the power to fix rates for gas and electricity by contract, but this doubt arises out of the fact that the Legislature has conferred upon cities the power to regulate rates of lighting companies, but has not conferred any such power as to street railway service. The only way that a city in Iowa can fix a rate for street railway service is by contract.

[2] The parties to this controversy agree that the franchise in this case constitutes a valid contract. No one claims that the court has any power to change this contract, or modify it in any particular. It is elementary that a court has no power to make contracts for individuals or corporations, nor to modify them when made. The only power the court has in relation to controversies of this kind is to construe a contract when its meaning is in doubt. That is the only question before the court in this case. The receivers claim that the franchise, taken as a whole, means one thing as to fares; the city claims that it means something else. This contract was made in 1915. It is to be regretted that, so soon after its execution, the parties should differ as to what it means.

Section 17 of the contract is definite as to rates for fare, and, if it stood alone, of course there would be no controversy about it; but the receivers claim that the provisions of section 17, as to fares, must be construed in connection with section 7, which provides definitely for the payment from the fares collected of certain amounts, consisting "of all costs of operation, including taxes and interest, at not to exceed 5 per cent. on the company's indebtedness represented by bonds, and not to exceed 6 per cent. on the remainder of such indebtedness, and the setting aside of a depreciation fund," after the expiration of three-year rehabilitation period.

Here it is important to consider certain elementary propositions, which should be understood, not only by the parties, but by the public, who are most directly interested in this contract. This corporation, at the time this contract was made, had certain outstanding capital stock; it also owed certain debts, some of which were represented by bonds, and some of which were ordinary obligations. It was also required by the contract that the company should make further expenditures in the way of extensions and betterments.

The total amount of the indebtedness of the company, which now totals $6,388,872.88, was agreed upon by the city and the corporation. To meet the interest upon this indebtedness, the operating expenses, taxes, and depreciation, of course, the corporation had no money, and would have no money, except as it received it from fares collected. The amount which would be received from fares, could only be ap-

proximated, and the amount of cost for operation could only be estimated, and of course, in the last year and a half, conditions with reference to the cost of operation have changed, so that anything contemplated at that time as the cost of operation proves to be entirely inadequate. For instance, it is stated by counsel that the increased cost of labor alone, under present wages, adds $174,000 per year to the expense of operation.

The contract specifically provides that the company shall pay (from fares collected, because there was no other source of income): (1) The cost of operation; (2) taxes; (3) 5 per cent. on the company's indebtedness represented by bonds; (4) 6 per cent. on the remainder of the indebtedness; and (5) a depreciation fund, which is to be fixed each year, with reference to replacement, renewals, and maintenance of equipment, etc. The contract also provides for what is termed "first-class" service.

It is the contention of the receivers, and for the purpose of this hearing only this contention is assumed to be true, that the income from fares will not pay the cost of operation, taxes, interest, and depreciation, and continue present service. It is here apparent, of course, that, if this contention is true, fares will have to be increased or service reduced. It will be observed that there is no claim that there should be any income to pay any dividend upon any of the capital stock, under present conditions, and under the terms of the contract; the contention simply being that, under the specific terms of the contract, the cost of operation, taxes, and depreciation must be met from the fares, and that they are not sufficient to pay them.

Under these circumstances the receivers contend that the contract contemplates that the service must be kept up, and therefore that the fares must be increased. It is the contention of the city that, if there must be a change in either the fares or the service, the change must be in the service, and that the fares cannot be increased. Evidence has been introduced as to the preliminary negotiations leading up to the adoption of the franchise. Provisions of the ordinance are pointed out, emphasizing the fact that "the first and primary purpose in making this contract is to secure to the public first-class modern street car service."

It is contended that the dominant element in the contract is the service, and that the fares are secondary, and therefore that, if either one must yield, it is the provision as to fares. With this contention I cannot agree. While the contract emphasizes the matter of service, the court cannot close its eyes to the fact, which is a matter of common knowledge, that in controversies over franchises for street railways the thing most prominent in the mind of the people (one of the parties to this contract) is rates of fare. Fares touch the people most directly, and I have no doubt, from all the evidence before the court, that so far as the people of Des Moines are concerned they assumed that the fare was definitely and finally determined by this franchise. In all the discussions, so far as the evidence discloses, there was no suggestion that at any time the fares might be increased. Upon different occasions, during the discussion of the franchise, when statements were made ex-

pressing the fact that fares were definitely fixed for the period of the franchise, no suggestion to the contrary was made by any one.

It is true, as contended by the receivers, that it was contemplated at the time that under this contract there should be income enough from fares to pay for the cost of the service, and such cost was definitely fixed and limited as aforesaid. Four things were clearly fixed in the minds of the parties: (1) The indebtedness upon which interest should be paid; (2) the rate of such interest; (3) the fares; and (4) the service.

[3] As between the fares and the service, looking at the language of the franchise, as to which is it most inflexible? The service in the nature of things could not be defined, except in general terms. Two supervisors were agreed upon, one representing the city and one the company, and in their hands was placed to a large extent the determination of the service to be rendered; and then a further provision is made that, in case of disagreement between the supervisors, the question upon which they do not agree shall be submitted to arbitration.

Of course, the people of Des Moines cannot have service which will not be paid for out of the fares. The receivers are asking no profits for the corporation—not a dollar upon its stock; they are simply claiming that the service demanded by the city of Des Moines cannot, under present changed conditions, be rendered from the present income. If this claim is true, of course, it is most unfortunate; and yet these parties have made a contract, and the court cannot modify its provisions. That this construction is necessary is apparent from the word "subject," in section 7, in relation to the extent and character of service. The language is as follows:

"As a guaranty of the service provided for in this section, it is agreed that no dividends on the outstanding stock of the company shall be considered or allowed in determining the quality, quantity, or kind of service the company is bound and obligated to furnish under this ordinance; it being understood and agreed that, subject to the payment of all costs of operation, including taxes and interest at not to exceed five (5%) per cent. on the company's indebtedness represented by bonds, and not to exceed six (6%) per cent. of the remainder of such indebtedness, and the setting aside of a depreciation fund as provided in section XXII of this ordinance, the city is entitled to have, and the company is bound to render, the first-class service as defined in this section."

The language, "it being understood and agreed that, subject to the payment of all the costs of operation, * * * the city is entitled to have, and the company is bound to render, the first-class service as defined in this section," is most significant. The service is made "subject" to having money from the income to render the service, and whatever service can be rendered from the income, after paying the fixed charges specified in the contract, must be held to be "first-class," within the meaning of the contract.

That the contract did not contemplate change of fares is further emphasized by the omission from the contract of any method of fixing higher fares. If it was in the minds of the parties that conditions might develop where fares would have to be adjusted to meet deficiency, the parties certainly would have agreed upon some method of fixing the increased fares. Of course, it is suggested that the fares would have to be fixed with reference to the deficiency; but here was a schedule

of fares, and it would be important to all parties to have determined whether the increase in fares should be in the 5-cent fare, or the six tickets for 25 cents, or in the fare of children, or in the fare of school pupils. If fares were to be increased, the company alone, so far as the contract specifies, would have the duty of fixing the increase, and inasmuch as the city has no power to regulate rates the council would have no supervision or control in the matter.

It is quite apparent that the contract was made in the absence of any contemplation of the existence of present conditions. It is apparent that everybody had in mind a continuance approximately of conditions existing at the time the contract was made. The new conditions may render it absolutely impossible for the people to get, under this contract, what they expected in the way of service; but the people are bound by the contract, as well as the company, and when they get that service which can be paid for under the provisions of the contract, they must of course be content.

It may be appropriate here to quote from the opinion of Judge Westenhaver in the recent case of Columbus Power & Light Co. v. City of Columbus (D. C.) 253 Fed. 499:

"It cannot be denied, on the showing made, that the present war has greatly increased the cost of street railway operation. The award of the National War Labor Board in the wage controversy cannot be regarded otherwise than binding on the company, and the increase of wages granted by the company pursuant thereto cannot, in any fair sense, be considered as its voluntary act. It is also undoubtedly true, on the showing made, that complainant cannot, under existing conditions finance any improvements required to meet new demands for heat, light, and power, or for increased street railway facilities, and its failure so to do must injure the interests of the defendant and its inhabitants as much as it injures the complainant.

"Prolonged operation under these conditions would seem to be a manifest impossibility, and must result in impairing the street railway service and grievously harming the people and business of the city. These considerations do not, for the reasons already stated, present any ground upon which a court can grant relief, for it has power only to declare the law and apply it. A sound public policy forbids usurpation by the courts of governmental power lodged in other departments of the government. No power inheres in a court, either to make contracts for parties, or to absolve them from the effect of their contracts, provided the parties are competent in law to contract, and no fraud intervenes in the making thereof.

"In view of these well-recognized limitations of the court's power, I can only suggest that the present emergency, likely as it is to become much graver in the near future, calls urgently for some kind of accommodation or temporary compromise between the parties."

The facts relating to the income and expenditure of the company are not before the court. These are matters which will have to be considered by the supervisors in relation to the matter of service; but the court may justly express surprise that there should be any dispute upon these matters. Section 20 of the contract requires that the company shall keep open its books at all reasonable times, showing "full, true, and accurate accounts of all moneys expended and liabilities incurred in connection with said business." The company is also required to furnish to the city supervisor "monthly reports of its car mileage and earnings, and expenses of operation, investments in renewals, bet-

terments, and additions, and such other statements and reports as the city supervisor or the city council may from time to time request," and the city supervisor at all times has full access to every paper, document, or voucher of the company.

It is apparent that the city and the citizens of Des Moines should have as full knowledge every month of the income and expenditures of this company as has the company itself, and in the interest of harmony, and avoidance of controversy and suspicion, the city and the public should take advantage of these rights which it has under its contract. If the deficiency between the earnings and the expenditures are such as claimed, an unfortunate situation is presented; but it is one with which the courts cannot deal. It must be solved by the people of Des Moines.