589 F.2d 1
 100 L.R.R.M. (BNA) 2516
 LOCAL DIVISION NO. 714, AMALGAMATED TRANSIT UNION, AFL-CIO,
an Unincorporated Association, Plaintiff, Appellant,
v.
GREATER PORTLAND TRANSIT DISTRICT OF PORTLAND, MAINE, a Body
Politic,Defendant, Appellee.
 No. 78-1077.
 United States Court of Appeals,
First Circuit.
 Argued June 7, 1978.
Decided Nov. 15, 1978.
 
 Lawrence J. Zuckerman, Gray, Me., with whom Earle W. Putnam, Washington, D. C., was on brief, for plaintiff, appellant.
 Brenda T. Piampiano, Portland, Me., with whom F. Paul Frinsko, and Bernstein, Shur, Sawyer & Nelson, Portland, Me., were on brief, for defendant, appellee.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 This appeal concerns an action brought in the District Court for the District of Maine by Local Division 714, Amalgamated Transit Union (the Union) seeking a declaratory judgment and injunction against the Greater Portland Transit District (the District) for its refusal to submit the parties' dispute regarding terms of a new collective bargaining agreement to binding arbitration. Arbitration of the terms of a new contract known as "interest arbitration" is alleged to be required by an agreement the parties entered into pursuant to § 13(c) of the Urban Mass Transportation Act, 49 U.S.C. § 1609(c) (UMTA). The court below, ruling from the bench, dismissed the Union's suit for lack of subject matter jurisdiction, and the Union has appealed. We are thus faced with the narrow but important question of whether the federal courts are vested with the authority to hear labor disputes of this type between the recipients of UMTA grants and their employees.
 
 I.
 
 2
 Under the UMTA, state and local agencies may obtain federal financial assistance for the providing of mass transportation services in urban areas. 49 U.S.C. § 1602. Section 13(c) of the Act, 49 U.S.C. § 1609(c), establishes as "a condition of any assistance . . . that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance." The section then proceeds to specify what the labor protective arrangements are to accomplish, including the preservation of existing collective bargaining rights. Finally, § 13(c) directs that the "terms and conditions of the protective arrangements" shall be specified in the financial assistance contract itself viz. the contract between the local authority and federal government.[1] In practice, the statute seems to have been read as leaving to the applicant for federal assistance and its employees, or their bargaining representative, the negotiating of a written agreement (called a § 13(c) agreement) containing the precise terms of mutually satisfactory protective arrangements, followed by approval of that agreement by the Secretary of Labor.
 
 
 3
 The case before us arises out of several financial assistance contracts between the District and the federal government. The District, a Maine state agency, has as its purpose the providing of motor vehicle mass transportation in the greater Portland area. From 1970 until early 1973, the District owned the office and garage facilities where buses were parked and maintained, but leased the facilities to the Greater Portland Transit Company, a private corporation, which operated the transportation services. Before and during this period, the Transit Company's employees were protected by the Labor Management Relations Act, 29 U.S.C. §§ 141-87, and the Union and the Transit Company were parties to successive collective bargaining agreements.
 
 
 4
 In late 1972, the District arranged to purchase the Transit Company. The District entered into a Capital Grant Contract (Grant No. 1) with the United States, pursuant to the UMTA, to receive federal funds for the project. The "project" was defined as the purchase of the Transit Company's assets, 15 new buses, and 15 locked registering fare boxes. The grant contract obliged the District to complete the project under the labor protective provisions of a § 13(c) agreement between the District and the Union dated December 8, 1972 ("1972 § 13(c) Agreement"), which the Secretary of Labor had approved; these provisions were incorporated by reference into the grant contract. The § 13(c) agreement provided in part for binding arbitration of labor disputes, including interest arbitration of the terms of new collective bargaining agreements.[2]
 
 
 5
 The District after receiving funding under the Act purchased the Transit Company's assets on January 1, 1973. Pursuant to the 1972 § 13(c) Agreement, the District succeeded to the Company's obligations under the then-existing collective bargaining agreement, which was due to terminate on December 31, 1973. When the agreement terminated, the Union and the District arrived at a new collective bargaining agreement apparently by utilizing, after impasse had been reached, the dispute settlement procedures provided by the Maine Public Employees Relations Law, 26 M.R.S.A. §§ 961 Et seq., rather than the binding interest arbitration provided by the 1972 § 13(c) Agreement. One procedure used was fact-finding in which both the District and the Union participated. The resulting 1974 collective bargaining agreement, as had the previous collective bargaining agreements, provided for non-interest arbitration but explicitly denied any requirement of interest arbitration. This collective bargaining agreement had an expiration date of December 31, 1976.
 
 
 6
 In February 1975, the District and the Union entered into a § 13(c) agreement ("1975 § 13(c) Agreement"), in relation to an application by the District for UMTA funding for the purchase of 35 new buses and fare boxes. This agreement again mandated binding interest arbitration. The agreement provided further that it would be "independently binding and enforceable by and upon the parties thereto . . . ." The Secretary of Labor approved this 1975 § 13(c) Agreement, and its employee protections became part of a Capital Grant Contract (Grant No. 2) with the United States for funding for the purchase of 39 new buses and fare boxes, which was executed in November 1975. At the same time, the District and the United States entered into an Operating Assistance Grant Contract (Grant No. 3) covering the District's operating expenses for calendar year 1975.
 
 
 7
 A year later, in November 1976, the District became a party to another § 13(c) agreement. This was the "National § 13(c) Agreement," which had been executed by the American Public Transit Association and the Transit Employee Labor Organizations in July 1975. The District became a party thereto by notifying the appropriate parties of its desire to have that agreement apply to the District's grants of operating assistance under the UMTA. The District requested specifically that "all applications submitted for Federal Operating Assistance under Section 5 and 3(h) of the Act for the period November 26, 1974 through September 30, 1977 Not heretofore certified by the Department of Labor be certified on the basis of the (National § 13(c) Agreement)." The Secretary of Labor certified the National § 13(c) Agreement for the District and the Union in November 1976. As the District's only previous application for operating assistance (Grant No. 3) already had been certified by the Secretary, however, the National § 13(c) Agreement apparently did not become part of a contract of assistance until April 1977. At that time the District and the United States entered into an Operating Assistance Contract (Grant No. 4) to cover the District's operating expenses for calendar year 1976. The National § 13(c) Agreement provided for binding non-interest arbitration, but did not itself provide for interest arbitration. Arguably, however, it incorporated the interest arbitration requirements of the prior § 13(c) agreements.
 
 
 8
 After the National § 13(c) Agreement was executed but before it was incorporated into the Grant No. 4 contract, the 1974 collective bargaining agreement terminated and the instant litigation arose. During the two months prior to the December 31, 1976 termination date, the District and the Union negotiated toward a new collective bargaining agreement. Early in January 1977, the negotiations reached impasse, and the parties were unable to agree as to what was the appropriate dispute settlement procedure to follow. The Union requested binding interest arbitration pursuant to the 1975 § 13(c) Agreement. The District refused, and instead had a mediator appointed by the Maine Labor Relations Board.
 
 
 9
 In March of 1977, the Union filed this complaint in the United States District Court for the District of Maine, asking for a declaration and injunction requiring the District to submit the disputed terms of the new collective bargaining agreement to binding interest arbitration pursuant to the 1975 § 13(c) Agreement. The complaint contains four counts: (1) that the District's refusal to arbitrate was a breach of the 1975 § 13(c) Agreement and thereby did not comply with § 13(c) of the UMTA; (2) that the District's refusal to arbitrate violated Maine law; (3) that the District's refusal violated the National § 13(c) Agreement; and (4) that the District violated the 1974 collective bargaining agreement by refusing to bargain in good faith. The Union premised jurisdiction on 28 U.S.C. §§ 1331 and 1337. The District's answer denied that the 1975 § 13(c) Agreement was in "full force and effect," denied that it was an industry affecting commerce (as required by § 1337), alleged as a defense that it was a quasi-municipal corporation and a political subdivision of the State of Maine, and asserted that the court lacked subject matter jurisdiction.
 
 
 10
 Since this appeal does not deal with the merits of the present dispute, we need not delve deeply into the parties' substantive contentions. The Union, suffice to say, feels the 1975 § 13(c) Agreement, mandating interest arbitration, is controlling and was operable in late 1976 and early 1977 because the project covered by Grant No. 2, the purchase of 39 new buses and fare boxes, was not yet completed. This view arguably aligns with the apparent intention of Grant Contract No. 2 that the 1975 § 13(c) Agreement would be in effect until the project, the purchase, was finished. The Union argues that the incorporation of the National § 13(c) Agreement into the subsequent assistance contract was not meant to preempt the prior § 13(c) agreement. The District, on the other hand, argues that the parties never meant to require binding interest arbitration. It points to the provision of the 1974 collective bargaining agreement expressly precluding interest arbitration, as well as to the fact that the parties utilized Maine's dispute settlement procedures in their 1974 collective bargaining. The District maintains that it was told and believed that the National § 13(c) Agreement superseded the 1975 § 13(c) Agreement. Further, it argues that because the employees have not been adversely affected by the federal grants, no contract rights ever arose under the 1975 § 13(c) Agreement. See 49 U.S.C. § 1609(c). Finally, the District challenges the enforceability of the 1975 § 13(c) Agreement's interest arbitration requirement on the ground that it lacked authority ever to agree to any such requirement.
 
 
 11
 The district court's order dismissing the suit for lack of subject matter jurisdiction was in response to the District's motion to dismiss both on that ground and for failure of the complaint to state a claim upon which relief could be granted. We address both grounds herein, both having been presented below. We turn first to the question of jurisdiction.
 
 II.
 
 12
 The Union asserts the existence of federal jurisdiction under 28 U.S.C. §§ 1331 and 1337. Both of these provisions require that the action "arise under" federal law, and it is well established that the "arising under" test is the same for either section. Jersey Central Power & Light Co. v. Local Unions, IBEW, 508 F.2d 687, 699 n.34 (3d Cir. 1975), Cert. denied, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976); See Peyton v. Railway Express Agency, Inc., 316 U.S. 350, 353, 62 S.Ct. 1171, 86 L.Ed. 1525 (1942). In Gully v. First National Bank, 299 U.S. 109, 112-13, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936), the Supreme Court said,
 
 
 13
 "How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. Starin v. New York, 115 U.S. 248, 257 (6 S.Ct. 28, 29 L.Ed. 388); First National Bank v. Williams, 252 U.S. 504, 512 (40 S.Ct. 372, 64 L.Ed. 690). The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. Ibid; King County v. Seattle School District, 263 U.S. 361, 363, 364 (44 S.Ct. 127, 128, 68 L.Ed. 339). A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto (New Orleans v. Benjamin, 153 U.S. 411, 424 (14 S.Ct. 905, 38 L.Ed. 764); Defiance Water Co. v. Defiance, 191 U.S. 184, 191 (24 S.Ct. 63, 48 L.Ed. 140); Joy v. St. Louis, 201 U.S. 332 (26 S.Ct. 478, 50 L.Ed. 776); Denver v. New York Trust Co., 229 U.S. 123, 133 (33 S.Ct. 657, 57 L.Ed. 1101)), and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. (Tennessee v. Union & Planters Bank, 152 U.S. 454 (14 S.Ct. 654, 38 L.Ed. 511); Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149 (29 S.Ct. 42, 53 L.Ed. 126); The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25 (33 S.Ct. 410, 57 L.Ed. 716); Taylor v. Anderson, 234 U.S. 74 (34 S.Ct. 724, 58 L.Ed. 1218).) Indeed, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense. Devine v. Los Angeles, 202 U.S. 313, 334 (26 S.Ct. 652, 50 L.Ed. 1046); The Fair v. Kohler Die & Specialty Co., supra."
 
 
 14
 For a recent case reaffirming these principles, See Phillips Petroleum Co. v. Texaco Inc., 415 U.S. 125, 94 S.Ct. 1002, 39 L.Ed.2d 209 (1974). See generally 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3562 (1975). The essential inquiry is thus whether the complaint, on its face, alleges a cause of action based on a right created by federal law, and whether the construction given to the federal law will be pivotal in the particular case.
 
 
 15
 Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), had more to say about "arising under" jurisdiction. Bell involved an action for damages brought by private parties against FBI agents for alleged violations of fourth and fifth amendment rights. The lower courts dismissed for want of federal jurisdiction. The Supreme Court reversed, holding that because the complaint squarely sought recovery on the ground that the agents violated the Constitution, federal question jurisdiction existed regardless of whether or not there was a federal cause of action or whether the complaint also alleged a state law claim.[3] The Court stated the jurisdictional rule as follows:
 
 
 16
 "(W)here the complaint, as here, is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions . . ., must entertain the suit. . . .
 
 
 17
 ". . . The . . . exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim . . . clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."
 
 
 18
 Id. at 681-83, 66 S.Ct. at 776. The Court added that if the complaint failed to state a proper cause of action, the correct disposition would not be dismissal for want of subject matter jurisdiction. Rather, a judgment on the merits in the form of a dismissal for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), would be appropriate. 327 U.S. at 682, 66 S.Ct. 773; Massachusetts Universalist Convention v. Hildreth & Rogers Co., 183 F.2d 497 (1st Cir. 1950).[4]
 
 
 19
 To apply these principles here, we first have to determine the theory of recovery set out in the complaint. Three interpretations can be advanced. The narrowest would be that the complaint shows, at most, a violation of a private contractual agreement between the Union and the District. The broadest would be that the complaint shows a violation of § 13(c) on the theory that § 13(c) commands interest arbitration a command the District ignored. A middle ground would be that the complaint shows a § 13(c) violation, not because § 13(c) requires interest arbitration, but because § 13(c), as a matter of clear inference, directs compliance with the mandated labor protective arrangements and implies a federal remedy for breach thereof in favor of those employees for whose benefit § 13(c) was enacted.
 
 
 20
 The district court read the complaint narrowly, as setting forth only a violation of private contract, rather than a violation of § 13(c). It reasoned that even though § 13(c) was "the principal factor leading the parties to enter into the agreement," the suit was on the contract, not the federal statute. On this premise, the complaint would not be viewed to be "so drawn as to seek recovery directly under the . . . laws of the United States." Bell v. Hood, 327 U.S. at 681, 66 S.Ct. at 776.
 
 
 21
 The district court further reasoned that any right the Union had to interest arbitration stemmed from the § 13(c) agreement, not § 13(c) itself. It thus rejected what we have termed the "broadest" construction of the complaint, namely, that relief is justified because § 13(c) itself commands interest arbitration. This latter construction was accepted by the district court in Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility, 445 F.Supp. 798 (W.D.Wis.1978), Aff'd, 585 F.2d 1340 (7th Cir. 1978). The LaCrosse district court credited the allegation that § 13(c) itself commanded interest arbitration under the circumstances, and on that basis found federal question jurisdiction to be present. This interpretation seems to us somewhat questionable. The statute does not mention interest arbitration, and while an interest arbitration provision in a § 13(c) agreement may possibly be seen as carrying out one or more of the five substantive labor protections guaranteed in § 13(c),[5] we are unable to translate any of these into a hard and fast command that interest arbitration be provided. In any event, we do not understand the present complaint to allege that the refusal to engage in interest arbitration constitutes, Per se, a direct violation of the federal statute. Hence we agree with the district court that federal jurisdiction is not to be premised on this construction.
 
 
 22
 We think, however, that the district court erred in failing to deal with the third, middle-ground, construction of the complaint. In its complaint, the Union expressly alleged that breach of the § 13(c) agreement constituted noncompliance with § 13(c) of the UMTA. The Union thus advanced the theory that breach of the terms of a labor protective arrangement made pursuant to the command of § 13(c) contravened that statute. The Union contends that by making it a condition of financial assistance that the District enter into fair and equitable arrangements as determined by the Secretary of Labor, and by commanding that the terms and conditions of such arrangements become part of the grant contract, Congress implicitly mandated both compliance with those arrangements and a federal remedy for their breach.
 
 
 23
 We think this reading of the complaint is compelled by its language, and that it precludes a ruling of no federal jurisdiction. Accord, Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility, 585 F.2d 1340, at 1346 (7th Cir. 1978); Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority, 582 F.2d 444, at 450 (8th Cir. 1978). Jurisdiction does not even require that the complaint necessarily state a valid claim upon which relief can be granted; all that is required is that the complaint is "so drawn as to seek recovery directly under the . . . laws of the United States . . . ." Bell v. Hood, 327 U.S. at 681, 66 S.Ct. at 776. As the present complaint was so drawn, it states a claim arising under federal law unless the assertion that rights under § 13(c) were denied by the District's refusal to arbitrate either "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction," or "is wholly insubstantial and frivolous." Id. at 682-83, 66 S.Ct. at 776.
 
 
 24
 Plainly the assertion of a § 13(c) violation is not "immaterial": the agreement for whose breach the Union seeks relief came into being because of § 13(c). Nor is it patently frivolous to contend that breach of labor protective arrangements formed under § 13(c) violates § 13(c) itself, or gives rise to a federal remedy. It is true that three district courts have found subject matter jurisdiction lacking in similar settings on essentially this basis, although they did not couch their determination in Bell's "wholly insubstantial and frivolous" phraseology. See Local Division 1285, Amalgamated Transit Union v. Jackson Transit Authority, 447 F.Supp. 88 (W.D.Tenn. 1977), Appeal docketed, No. 78-1185 (6th Cir. May 16, 1978); Division 580, Amalgamated Transit Union v. Central New York Regional Transportation Authority, No. 77-CV-45 (N.D.N.Y. Oct. 19, 1977), Vacated as moot, 578 F.2d 29 (2d Cir. 1978); Metropolitan Atlanta Rapid Transit Authority v. Local Division 732, Amalgamated Transit Union, No. 18429 (N.D.Ga. July 11, 1973). Each of those courts acknowledged the complaint before it to claim that the alleged violation of the § 13(c) labor protective agreement constituted a violation of § 13(c) itself, but denied federal question jurisdiction because it saw no federal issue involved. But, two federal issues obviously were raised: first, whether breach of the terms of labor protective arrangements made under § 13(c) violates § 13(c), and second, whether there is a federal cause of action for such a breach. The Jackson, Atlanta, and Central New York courts evidently felt those issues to be so insubstantial as to require disposition on jurisdictional grounds. The district court's decision below also can be viewed this way, rather than as having narrowly interpreted the complaint not to allege a violation of § 13(c). We cannot, however, accept the conclusion of frivolity. Two circuit courts, in the Kansas City and LaCrosse cases, Supra, have recently found federal jurisdiction in circumstances very similar to this; and, as our later analysis indicates, we are ourselves persuaded to imply from § 13(c) a federal remedy.
 
 
 25
 The criteria stated in Gully and Bell v. Hood are satisfied when the complaint is read in the foregoing manner. The claim presents the court with the two issues mentioned in the preceding paragraph, plus (assuming the first two are surmounted) the issue on the merits of whether there actually was a violation of the § 13(c) agreement here.
 
 
 26
 Our conclusion that federal question jurisdiction is appropriate is reinforced by International Association of Machinists v. Central Airlines, Inc., 372 U.S. 682, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963). In that case an airline board of adjustment was set up by an agreement between Central Airlines and its employees' union pursuant to section 204 of the Railway Labor Act, 45 U.S.C. § 184, which required that the board be established by a private contract. It was the board's function to resolve disputes growing out of application of the parties' collective bargaining agreement, and under the Act the board's awards were final and binding, 45 U.S.C. § 153 Second. The litigation arose when the union sought enforcement of such an award in federal court upon the airline's refusal to comply therewith. The Supreme Court held that the action to enforce the award arose under federal law, giving rise to federal question jurisdiction. The thrust of the Court's analysis was as follows:
 
 
 27
 "The contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy. If any provision contained in a § 204 contract is enforceable, it is because of congressional sanction: '(T)he federal statute is the source of the power and authority . . . . The enactment of the federal statute . . . is the governmental action . . . though it takes a private agreement to invoke the federal sanction. . . . A union agreement made pursuant to the Railway Labor Act has, therefore, the imprimatur of the federal law upon it . . . .' Railway Dept. v. Hanson, 351 U.S. 225, 232 (76 S.Ct. 714, 100 L.Ed. 1112). That is, the § 204 contract, like the Labor Management Relations Act § 301 contract, is a federal contract and is therefore governed and enforceable by federal law, in the federal courts."
 
 
 28
 372 U.S. at 692, 83 S.Ct. at 962. Because the instant case likewise involves enforcement of a contract formed pursuant to federal law, Central Airlines supports our conclusion that federal question jurisdiction exists.[6]
 
 
 29
 In addition to the presence of a substantial federal question, a prerequisite for jurisdiction under 28 U.S.C. § 1331 is that "the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs . . . ."[7] The Union's amended complaint made the following allegation regarding the amount in controversy:"Plaintiff has been damaged in an amount greater than $10,000.00 by virtue of Defendant's refusal to pay cost-of-living escalator increments as under the expired working agreement, and because of, among other things, Defendant's refusal to arbitrate, the members of the Plaintiff are without a pension plan, do not have unemployment benefits, and are in a state of limbo without assurance of employment, all of which is in excess of the $10,000.00 jurisdictional amount."
 
 
 30
 The District argues that the Union has not shown by this allegation that the requisite amount is in controversy. We note at the outset that in the similar Kansas City and LaCrosse cases, the eighth and seventh circuits respectively found the $10,000 jurisdictional amount to be in controversy. Division 1287, Amalgamated Transit Union v. Kansas City Area Transportation Authority, 582 F.2d 444, at 450 (8th Cir. 1978); Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility, 585 F.2d 1340, at 1348-1349 (7th Cir. 1978).
 
 
 31
 In Saint Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288-89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938), the Supreme Court set out what remain the controlling principles guiding a determination of whether or not an action meets the jurisdictional amount:
 
 
 32
 "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." (Citations omitted.)
 
 
 33
 See Jimenez Puig v. Avis Rent-A-Car System, 574 F.2d 37 (1st Cir. 1978). These principles apply equally to actions for declaratory and injunctive relief. See Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 346, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). There is no indication that the Union's jurisdictional amount assertion was not made in good faith. Accordingly, to warrant dismissal of the complaint on jurisdictional amount grounds it would have to appear "to a legal certainty" that the amount in controversy actually does not exceed $10,000. Such is not the case here.
 
 
 34
 The Union is suing in its representative capacity to vindicate the rights of employees to binding interest arbitration under the collective § 13(c) protective arrangements. It has standing to do so. See Smith v. Evening News Association, 371 U.S. 195, 200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); Cf. Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (an association may have standing solely as representative of its members). The Union therefore can rely upon the actual or threatened injury to individual employees in establishing the jurisdictional amount. Hunt v. Washington Apple Advertising Commission, 432 U.S. at 346, 97 S.Ct. 2434.
 
 
 35
 The Supreme Court held in Hunt that a representative plaintiff such as the Union can establish the requisite amount in controversy if the claims of at least some of the individuals represented exceed that amount. Thus, the jurisdictional amount in controversy is met in this case unless it is clear "to a legal certainty" that the rights to interest arbitration of not even some of the employees is worth $10,000. It is hard to say this is so. But we do not rest on that premise. We would also venture that the Union is entitled to aggregate the value of its members' claims to satisfy the jurisdictional amount requirement. To be sure, the Supreme Court in Hunt reserved the question of whether a representative plaintiff could aggregate individual claims in establishing the jurisdictional amount. But while the issue is thus as yet undecided, there are convincing reasons to aggregate in these circumstances.
 
 
 36
 It is the rule that "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount." Zahn v. International Paper Co., 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973), quoting Troy Bank v. G. A. Whitehead & Co., 222 U.S. 39, 40-41, 32 S.Ct. 9, 56 L.Ed. 81 (1911). On the other hand, when two or more plaintiffs having "separate and distinct" claims unite for "convenience and economy" in a single class action, each member of the class must satisfy the jurisdictional amount requirement. Id.; Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). The distinction between "a common and undivided interest" and "separate and distinct" claims is not entirely clear. C. Wright, Law of Federal Courts § 36, at 139 (3d ed. 1976). It can nonetheless be said that the individual employees in the present case are not united merely for litigation "convenience and economy" as in Zahn and Snyder. Their claims are united in this single action by the Union in conformance with the fundamental premise of collective bargaining that a union is to represent its members in all aspects of the labor-management relationship. This premise is part of national labor policy. NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). Also, any right to interest arbitration under the § 13(c) agreement cannot be viewed practically as a right possessed by each employee individually, because it can only be exercised collectively. To be sure, each employee benefits from that right; it has economic value to each that should be included in determining the amount in controversy. But its collective nature would seem to make it a "single right," within the meaning of Troy Bank.
 
 
 37
 Moreover, in actions seeking declaratory or injunctive relief the amount in controversy is measured by the value of the object of the litigation. Hunt v. Washington Apple Advertising Commission, 432 U.S. at 347, 97 S.Ct. 2434; McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 181, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co., 239 U.S. 121, 126, 36 S.Ct. 30, 60 L.Ed. 174 (1915); Hunt v. New York Cotton Exchange, 205 U.S. 322, 336, 27 S.Ct. 529, 51 L.Ed. 821 (1907); 1 J. Moore, Federal Practice PP 0.95, 0.96 (2d ed. 1975); C. Wright, A. Miller & E. Cooper, supra, § 3708. The Union's object is binding arbitration of the disputed terms of the parties' collective bargaining agreement.[8] The value of that arbitration would seem to be the difference between the expected value of the terms under the arbitration award and the value of the terms that would exist in the absence of arbitration. The value of the arbitration is impossible to determine precisely, because both the terms of the arbitration award and the terms of employment in the absence of arbitration are speculative. These valuation problems make it virtually impossible to conclude to a legal certainty on the current record that the amount in controversy is less than the required $10,000. This is especially so, because of the reasonableness of the claim that the aggregate interest of the 107 employees exceeds $10,000. The District presently is paying wages (presumably at the rate set by the former collective bargaining agreement), but has not made cost-of-living increases as called for by the former agreement. On this cost-of-living factor alone, the Union claims a $35,000 total loss. Further, it is not clear whether or not the District, in the absence of a new agreement, would abide by other provisions of the former agreement, such as those governing discipline and discharge procedures, grievances, vacations, medical insurance, or pensions. In light of these considerations, we conclude that the Union's allegation that the amount in controversy exceeds $10,000 satisfies the jurisdictional amount requirement of § 1331, and that subject matter jurisdiction over the Union's action exists pursuant to that provision. In view of this, we need not consider the applicability of § 1337.
 
 III.
 
 38
 While contrary to the district court we conclude that there is subject matter jurisdiction, that ruling does not end matters. Notwithstanding federal jurisdiction over the subject matter of the Union's § 13(c) claim, the summary dismissal by the district court must be affirmed if the Union has failed to state a claim upon which relief can be granted. See, e. g., Wheeldin v. Wheeler, 373 U.S. 647, 649, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Massachusetts Universalist Convention v. Hildreth & Rogers Co., 183 F.2d 497 (1st Cir. 1950).[9]
 
 
 39
 The Union's claim, as stated earlier, is that by violating the § 13(c) agreement, the District violated § 13(c) itself. The theory underlying this claim is that § 13(c) requires compliance with whatever labor protective arrangements are developed under its mandate, approved by the Secretary of Labor, and specified in an UMTA assistance contract. A two-part inquiry is necessary to determine whether this claim is remediable.[10] We first must decide whether a breach of such a protective arrangement constitutes, implicitly if not expressly, a violation of § 13(c). If so, we must then determine whether the Union has a private federal remedy for a statutory violation of that nature.
 
 A.
 
 40
 Section 13(c) of the UMTA does not explicitly require compliance with the labor protective arrangements that it dictates must be made as a condition of financial assistance under the Act. We feel, however, that § 13(c) clearly implies a requirement that the protections upon which assistance is conditioned be honored.
 
 
 41
 The § 13(c) statutory scheme is more extensive than at first meets the eye. Section 13(c) commands, as a condition of receipt of federal financial assistance, that labor protective arrangements be made that are deemed fair and equitable by the Secretary of Labor. These arrangements are not only to be fair and equitable in some general sense, but "shall include" provisions necessary to carry out major substantive guarantees to transit workers that Congress lists in the statute, e. g., preservation of rights under existing collective bargaining agreements, protection of individual employees against a worsening of their employment positions, and priority in reemployment. See notes 1, 5, supra. Moreover, § 13(c) directs that the terms and conditions of the approved labor protective arrangements be specified in the federal grant contract itself. The statute thus does more than prescribe the making of any kind of fair labor arrangements between a federal grantee and its employees. It confers far-reaching protections upon employees of grant recipients. It assures, in addition, that arrangements guaranteeing these protections will be made, approved by the highest federal labor official and embodied in the federal grant contract itself.
 
 
 42
 This statutory scheme leaves room for no conclusion but that Congress intended that grant recipients must comply with the arrangements. The statute would be utterly meaningless if the arrangements were not observed. The object of the statute is to afford certain protections to transit workers; if it required only that the arrangements be made but not that they be respected, it would fail in this purpose, since no other machinery is provided for translating the protections into reality. Our conclusion accordingly is that § 13(c), implicitly though not expressly, commands compliance with the labor protective arrangements by the grant recipient. Accord, Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility, 585 F.2d 1340, at 1346 (7th Cir. 1978). Noncompliance effectively violates § 13(c).
 
 
 43
 Section 13(c)'s implied requirement of compliance is not limited, moreover, to just those arrangements that may be said to be commanded by the substantive provisions articulated in § 13(c). Thus here the absence of an express requirement for interest arbitration is not significant. The statutory emphasis is upon the securing of fair and equitable arrangements to protect the interests of employees, as determined by the Secretary of Labor, which arrangements shall include "without being limited to," certain specified provisions. Once the labor protective arrangements have been made, approved, and incorporated in the grant contract they have become the vehicles for carrying out Congress' purpose. We believe that Congress contemplated that a grant recipient would comply with all the terms and conditions of an approved protective arrangement upon which the grant was conditioned, regardless of whether or not other terms and arrangements would have been equally acceptable under § 13(c).
 
 B.
 
 44
 Having concluded that § 13(c) contemplates that a grant recipient live up to the labor protective arrangements upon which its grant is conditioned, and that noncompliance therefore violates § 13(c), the next aspect of the inquiry is whether there is a private federal remedy available to the Union for breach of such an arrangement. The UMTA does not explicitly provide such a remedy. As a result, the Union can prevail only if such a remedy is implicit in the Act.
 
 
 45
 The Union argues that we do not need to imply a private cause of action, because "the statutory command to make a contract expressly creates a private action to enforce the contract and enforcement of the contract directly, indirectly and automatically enforces the statute." Similarly, the court in LaCrosse stated:
 
 
 46
 " 'Congress intended that the contracts embodying the 'fair and equitable arrangements' were to be enforceable contracts. It would be fatuous to suggest otherwise. Because the contracts were to be enforceable, it follows that they were to be enforced at the instance of the parties to the contracts.' "
 
 
 47
 585 F.2d at 1349-50. This analysis is perhaps too simple. Section 13(c) nowhere commands the making of a contract between a union and a grant recipient setting forth the terms of the labor protective arrangements. To be sure Congress contemplated that "specific conditions for worker protection will normally be the product of local bargaining and negotiation." H.R.Rep.No. 204, 88th Cong., 2d Sess., reprinted in (1964) U.S.Code Cong. & Admin.News, pp. 2569, 2584-85. But, Congress did not require that the labor protective arrangements be included in any contract other than the grant contract, to which the union is not a party. We feel that an implied congressional intention that contracts between unions and employers, which Congress neither required nor contemplated would be made in all cases, be federally enforceable is not a wholly adequate basis upon which to premise a union's right to enforce § 13(c) labor protective arrangements in federal court. We reach a similar result by a slightly different route. We think it proper to infer that § 13(c) implies a private federal cause of action for breach of the terms and conditions of the labor protective arrangements whether or not embodied in an actual contract between the employer and its employees.
 
 
 48
 We begin by recognizing that this case is somewhat different from those decided by the Supreme Court dealing with the implication of a remedy. In Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and other cases of this genre, there typically has been a federal statute, criminal or civil, whose express substantive commands are alleged to have been violated; the plaintiff has professed to be of the class for whose benefit the statute was enacted; and the question has been whether he may bring a private action for the statutory breach in the absence of explicit authority being given to his class to bring private actions. Often in the picture, also have been alternative express remedies such as provision for agency enforcement without any provision for a private suit. See, e. g., National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 471, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Here, however, only an implied statutory command that the labor protective arrangements be complied with is allegedly violated. The substantive right to interest arbitration asserted stems from the contract only, not the statute. In addition, there is no explicit private remedy.
 
 
 49
 But while this case does not neatly fit within the Cort paradigm, we believe that implication of a federal remedy is appropriate for reasons that, in the end, are entirely consistent with the logic of Cort v. Ash. Section 13(c), as we have seen, is an extensive and federally-oriented statutory scheme. It commands, as a condition of UMTA assistance, the making of labor protective arrangements whose content must meet minimal specified substantive requirements and have the approval of the Secretary of Labor. Section 13(c) commands in addition that the terms and conditions of the arrangements be specified in the federal grant contract. The protective arrangements thus give rise to federally-created rights, and we are mindful that "(i)t is not uncommon for federal courts to fashion federal law where federal rights are concerned." Textile Workers v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). To leave to the courts of fifty states the enforcement of labor protective arrangements that were formed, approved by the Secretary of Labor, and specified in federal grant contracts in order to carry out federally-created rights would seem anomalous indeed. But what tips the scale further, and decisively we think, in favor of a federal remedy is that the federal financial assistance contract between the Secretary of Transportation and the grantee is enforceable in federal court in suits brought by the Secretary. 49 U.S.C. § 1608(a); 12 U.S.C. § 1749a(c)(3) & (4); 28 U.S.C. § 1345. Section 13(c)'s requirement that the terms and conditions of the labor arrangements be part of the grant contract therefore makes them enforceable in federal court in suits by the Secretary of Transportation. Congress clearly contemplated that the labor protective arrangements would be subject to federal court enforcement proceedings, at least in suits brought by the Secretary of Transportation. Moreover, such suits in federal court to enforce the terms of a grant contract would be governed by federal substantive contract law, not varying state law dependent upon venue. Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 92 L.Ed. 32 (1947); United States v. Standard Rice Co., 323 U.S. 106, 111, 65 S.Ct. 145, 89 L.Ed. 104 (1944); cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). By contrast, there is no countervailing indication that Congress meant to leave these matters to localized state court decision. A preference for federal jurisdiction is understandable given the inevitable interrelation between the negotiated labor protective arrangements and the federal statute dictating them; enforcement litigation will surely involve interpreting the protective arrangements in light of the purposes and policies of § 13(c), as well as resolving issues relating to the interplay between federal and state labor policies and possible supremacy clause problems.
 
 
 50
 As well as contemplating enforcement of the labor protective arrangements in federal court at the suit of the Secretary of Transportation, Congress also must have contemplated that protected transportation employees would be able to institute private enforcement actions. Employees covered by a § 13(c) agreement, or their union, could of course bring a contract action, in state if not federal court, to enforce the agreement. In addition, protected employees, whether covered by a § 13(c) agreement or not could likely enforce the protections as donee or intended beneficiaries of the assistance contract between the Secretary of Transportation and their employer. See Euresti v. Stenner, 458 F.2d 1115, 1118-19 (10th Cir. 1972); United States ex rel. Johnson v. Morley Construction Co., 98 F.2d 781, 788-89 (2d Cir. 1938); Restatement of Contracts §§ 133, 135 (1932).[11] Lastly, it seems plausible, although we do not undertake to decide the question, that protected employees could successfully maintain a suit under the Administrative Procedure Act, 5 U.S.C. §§ 701-06, to compel the Secretary of Transportation to institute action in federal court to enforce the labor protective obligations of a recipient of UMTA funding. See generally Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
 
 
 51
 We do not rest on these considerations alone in implying a private federal remedy on the Union's behalf. The Supreme Court in Cort v. Ash, 422 U.S. at 78, 95 S.Ct. at 2088, identified four factors it regarded as key to the implication of a private remedy from a federal statute. These factors were described as follows:
 
 
 52
 "First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,' Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39 (36 S.Ct. 482, 484, 60 L.Ed. 874) (1916) (emphasis supplied) that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453, 458, 460 (94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646) (1974) (Amtrak ). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, e. g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 423 (95 S.Ct. 1733, 1740, 44 L.Ed. 263) (1975); Calhoon v. Harvey, 379 U.S. 134 (85 S.Ct. 292, 13 L.Ed.2d 190) (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See Wheeldin v. Wheeler, 373 U.S. 647, 652 (83 S.Ct. 1441, 1445, 10 L.Ed.2d 605) (1963); cf. J. I. Case Co. v. Borak, 377 U.S. 426, 434 (84 S.Ct. 1555, 1560, 12 L.Ed.2d 423) (1964); Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 394-395 (1971); id., at 400 (91 S.Ct. 1999, 2003-2004, 29 L.Ed.2d 619) (Harlan, J., concurring in judgment)."
 
 
 53
 The first Cort factor is plainly met here. Transit workers affected by UMTA assistance are the especial beneficiaries of § 13(c), and Congress created a federal right in their favor by directing that the labor protective arrangements be made, implying that they be abided by, and requiring that their terms and conditions be specified in the federal grant contract.
 
 
 54
 The second Cort factor indication of a legislative intent, explicit or implicit, to create a private federal remedy is also met. To a major extent, § 13(c) relies upon privately-negotiated arrangements which, by their nature, invite private enforcement. And we think that Congress signalled an intention to authorize federal rather than merely state court enforcement when it directed that the labor protective arrangements be incorporated in the federal grant contracts. It would be anomalous if arrangements forming a part of the terms of that federally enforceable contract were enforceable by the protected employees only in state tribunals. In addition, since the Secretary of Transportation is not an official usually charged with protecting the rights of labor, we think Congress would reasonably have assumed that the persons for whose benefit the protective provisions were inserted the transit workers and their unions would themselves be permitted to enforce these rights in the forum in which litigation concerning the terms of the federal grant would normally occur. The statute delegates no such enforcement authority to the Secretary of Labor the logical federal official to enforce such rights if they were to be enforceable only by a public officer. And we are aware of no affirmative reason why Congress would think it disadvantageous for the intended beneficiaries of this legislation to act in their own behalf, especially where the labor arrangements would likely be in the form of a contract to which they were a party. Cf. National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646.
 
 
 55
 Application of the third Cort factor turns on whether the "legislative scheme" against which to test the implied remedy is the entire UMTA or just § 13(c). If the former, the third factor is probably beyond us: a court cannot accurately say whether an implied remedy for labor will in these circumstances further or hinder the goals of mass transportation. If the legislative scheme is defined as § 13(c) alone, however, it would seem obvious, for reasons to which we have already partially alluded, that there are distinct benefits to the employees in having a private remedy in the federal courts. The Secretary of Transportation is unlikely to move as swiftly as the employees to sue for breach of the protective arrangements, and the state courts, or some of them, may be less concerned to interpret the arrangements in light of Congress' purposes in enacting § 13(c). The § 13(c) protective arrangements are not merely the product of private contracts, freely negotiated, but are vehicles for carrying forward the substantive labor policies set forth in the federal statute. If the arrangements are to serve their labor protective function,
 
 
 56
 "their validity, interpretation, and enforceability cannot be left to the laws of the many States, for it would be fatal to the goals of the Act if (an arrangement) contrary to the federal command were nevertheless enforced under state law or if (an arrangement) were struck down even though in furtherance of the federal scheme."
 
 
 57
 International Association of Machinists v. Central Airlines, Inc., 372 U.S. at 691, 83 S.Ct. at 961. Therefore, effective federal enforcement of the terms of the labor protective arrangements, in the form of private actions by protected transportation workers, would serve the purposes underlying § 13(c).
 
 
 58
 Finally, we think the fourth Cort factor points in favor of an implied federal remedy. The Union's precise cause of action, an action to enforce the labor protective arrangements created pursuant to § 13(c), could not exist without the UMTA. It was pursuant to the UMTA that the Union and the District entered into the § 13(c) agreements and the agreements' protective arrangements were incorporated into the assistance contracts between the District and the federal government. It therefore seems manifest that enforcement of the protective arrangements is not a function traditionally relegated to state law nor basically a concern of the states. Congress was concerned with enforcement, and contemplated at least some enforcement in federal courts.
 
 
 59
 It is true that if the Union's action were viewed narrowly as just an action to enforce the § 13(c) agreement, an argument could be made that it is one traditionally relegated to state law. The basis for the argument would be that collective bargaining agreements between a state agency and the representative of its employees traditionally are governed by state law and enforced in state courts. See 29 U.S.C. §§ 152(2), 185, 187. While § 13(c) agreements are not usual collective bargaining agreements specifying terms and conditions of employment, they are somewhat analogous. Section 13(c) agreements, however, differ from usual collective agreements entered into by state and local agencies in that their terms are regulated by federal law. The UMTA requires that § 13(c) agreements be made, and places important requirements on their content. Usual collective bargaining agreements covering state employees are subject only to state regulation. See 29 U.S.C. § 152(2); cf. National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (wages and hours of state employees constitutionally excluded from federal regulation). Therefore, the traditional allocation to state courts of enforcement of state collective agreements is not a basis for holding that enforcement of arrangements pursuant to § 13(c) should also be left to state tribunals. Federal regulation makes enforcement of the labor protective arrangements the concern of the federal government, not "basically the concern of the States," rendering an implied federal remedy not inappropriate under Cort's fourth factor.
 
 
 60
 We therefore conclude that the Union does have a federal cause of action, implied from UMTA § 13(c), to enforce the labor protective arrangements to which the District agreed as a condition of federal financial assistance under the Act.[12] The Union's complaint thus states a claim upon which relief can be granted and over which the district court has subject matter jurisdiction. Of course, nothing herein is meant to indicate our views on the merits of the action.
 
 
 61
 Reversed and remanded for proceedings not inconsistent herewith.
 
 
 
 [1]
 Section 13(c) provides in full:
 "(c) It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements."
 
 
 [2]
 Interest arbitration differs from the arbitration of grievances in that the latter calls for the arbitrator merely to "apply the contract" to the facts of a particular situation, while the former leaves to the arbitrator the determining of the terms and conditions of the next labor contract between the parties. Section 13(c) does not expressly require that labor protective arrangements provide for interest arbitration in order to conform to statutory norms; and it is not represented that the Secretary of Labor has made any such requirement as a precondition to his approval
 
 
 [3]
 The Bell Court concluded that the claim for damages based on fourth and fifth amendment violations sufficed to establish federal question jurisdiction, even though Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), had not yet been decided
 
 
 [4]
 On remand, the district court in Bell v. Hood took jurisdiction but dismissed the suit for failure to state a federal cause of action. 71 F.Supp. 813, 820-21 (S.D.Cal.1947)
 
 
 [5]
 The "protective arrangements" mandated in § 13(c),
 "shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs."
 See note 1, Supra, for full text of § 13(c).
 
 
 [6]
 While Central Airlines provides support for our conclusion that jurisdiction is present here, it is not on all fours with the instant case. The right sought to be enforced in Central Airlines the right to binding arbitration was expressly created by the statute. The statute required the creation of the board of adjustment, 45 U.S.C. § 184, and specified that it would settle labor disputes through binding arbitration, 45 U.S.C. § 153 Second. The mandated contract served only to implement that right by creating the board. In the instant case, on the contrary, the right to arbitration sought to be enforced was created by the mandated contract only, not by § 13(c)
 
 
 [7]
 There is no jurisdictional amount requirement under § 1337, the alternative provision under which jurisdiction is here asserted; however, the statute sought to be enforced must regulate commerce or protect trade and commerce. We do not reach the question of the applicability of § 1337 in view of our conclusion that the jurisdictional amount requirement of § 1331 is satisfied
 
 
 [8]
 Davenport v. Procter & Gamble Mfg. Co., 241 F.2d 511 (2d Cir. 1957), involved a diversity action by a union president to compel the employer to arbitrate a dispute over the wage rate, as required by the collective bargaining agreement. The court held that the jurisdictional amount requirement was satisfied, stating:
 "In considering the jurisdictional amount requirement the court should look through to the possible award resulting from the desired arbitration, since the petition to compel arbitration is only the initial step in a litigation which seeks as its goal a judgment affirming the award."
 Id. at 514.
 
 
 [9]
 The issue of implied remedy was raised in the district court by appellees' motion to dismiss for failure to state a claim, and has, in full substance, been argued and briefed by both sides, albeit in the context of determining whether the Union's claim was insubstantial, frivolous or made solely to obtain jurisdiction. The issue is closely interwoven with the question of subject matter jurisdiction. This is not, therefore a situation where a remand is required so that the district court may consider the question first. See Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); cf. Molina-Crespo v. Califano, 583 F.2d 572 (1st Cir. 1978)
 
 
 [10]
 See discussion supra
 
 
 [11]
 See also McDaniel v. University of Chicago, 548 F.2d 689, 694 (7th Cir. 1977), cert. denied, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978); City of Inglewood v. City of Los Angeles, 451 F.2d 948, 954-56 (9th Cir. 1972); Bossier Parish School Board v. Lemon, 370 F.2d 847 (5th Cir.), Cert. denied, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967)
 Unless the presence of diversity jurisdiction made it clearly cognizable by a federal court, such a third-party action might be limited to a state court, although federal question jurisdiction would possibly be open. See generally Miree v. DeKalb County, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977).
 
 
 [12]
 Our conclusion that § 13(c) implicitly provides the Union with a cause of action reinforces our determination that the Union's claim arises under federal law for jurisdictional purposes. Ivy Broadcasting Co. v. A.T.&T., 391 F.2d 486, 489 (2d Cir. 1968); McFaddin Express, Inc. v. Adley Corp., 346 F.2d 424, 426 (2d Cir. 1965), cert. denied, 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966); T. B. Harms Co. v. Eliscu, 339 F.2d 823, 826-28 (2d Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); C. Wright, A. Miller & E. Cooper, supra, § 3562 at 402-03